QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
  Todd M. Briggs (Bar No. 209282)
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California  94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100
Email:         claudestern@quinnemanuel.com
               toddbriggs@quinnemanuel.com

Attorneys for Defendant and Counterclaimant,
RIVERBED TECHNOLOGY, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUANTUM CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>RIVERBED TECHNOLOGY, INC.,<br><br>    Defendant. | CASE NO. C 07-4161 WHA<br><br>**RIVERBED'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS QUANTUM'S PATENT INFRINGEMENT CLAIMS UNDER U.S. PATENT NO. 5,990,810 FOR LACK OF SUBJECT MATTER JURISDICTION** |
| RIVERBED TECHNOLOGY, INC.,<br><br>    Counterclaimant,<br><br>vs.<br><br>QUANTUM CORPORATION,<br><br>    Counterdefendant. | Date:  January 31, 2008<br>Time:  8:00 a.m.<br>Judge: The Honorable William Alsup |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................................1

II. THE LICENSE BETWEEN A.C.N. 120 AND QUANTUM DID NOT TRANSFER RIGHTS IN THE '810 PATENT FROM ROCKSOFT TO QUANTUM .............................................................................................................................2

    A. Rocksoft Was Not A Signatory To The License Between A.C.N. 120 And Quantum ..................................................................................................2

    B. A.C.N. 120 Did Not Have The Authority To Assign Rocksoft's Property To Quantum ..............................................................................................3

    C. Under The Patent Act, Any Exclusive License To The '810 Patent Must Be Signed By The Patent Owner – Rocksoft ........................................4

    D. The December 24, 2007 Assignment From Rocksoft To A.C.N. 120 Undermines Quantum's Contention that A.C.N. 120 Could Unilaterally License Rocksoft's '810 Patent ....................................................................4

III. QUANTUM DOES NOT HAVE STANDING TO SUE FOR INFRINGEMENT OF THE '810 PATENT UNDER *ATMEL* .................................................................................5

    A. The Holding in *Atmel* Is Contrary To Federal Circuit Precedent And the Patent Act ........................................................................................................5

    B. Even Under *Atmel*, Quantum Has Not Established That It Has Standing .............. 10

IV. ANY DOUBT IN QUANTUM'S STANDING SHOULD BE RESOLVED IN FAVOR OF DISMISSAL ................................................................................................... 12

V. CONCLUSION ................................................................................................................... 12

## I. INTRODUCTION

Over the past two months, Quantum has advanced four different theories that it had standing to sue for infringement of the '810 patent. First, Quantum claimed that it had standing because it held an "exclusive license" to the '810 patent from A.C.N. 120. (Riverbed's Motion to Dismiss at 2-4.) Quantum abandoned this theory after Riverbed pointed out that Rocksoft held legal title to the '810 patent when the complaint was filed and there was a gap in the chain of title between Rocksoft and A.C.N. 120. Second, several weeks later, Quantum tried to fix its standing problem through a hastily executed assignment of the '810 patent from Rocksoft to A.C.N. 120, signed and produced to Riverbed on December 24, 2007. Quantum apparently believed that this post-complaint assignment would cure the standing defect. But after Riverbed demonstrated in its motion to dismiss that defects in initial standing cannot be cured through agreements signed after the filing of the complaint, Quantum abandoned this theory.

Quantum now advances two new standing theories in its opposition brief. *First*, Quantum contends it has standing because the license granted by A.C.N. 120 to Quantum was written on behalf of A.C.N. 120 "and its subsidiaries," and since Rocksoft is an A.C.N. 120 subsidiary, the '810 patent was automatically licensed to Quantum through A.C.N. 120. This theory fails too, however, because (1) Rocksoft did not sign the license to Quantum; (2) Quantum has not produced any documentation showing that A.C.N. 120 had the authority to assign property owned solely by Rocksoft to Quantum (or anyone else); and (3) under 35 U.S.C. § 261, any exclusive license from Rocksoft must be in writing and signed by Rocksoft.

Moreover, this theory is completely undermined by Rocksoft's December 24, 2007 outright assignment of legal title to the '810 patent to A.C.N. 120. This assignment states: "Assignor [i.e., Rocksoft] represents and warrants that it ***has not granted*** and will not grant to others any rights inconsistent with the rights granted by this Assignment." This statement by the owner of the '810 patent is completely inconsistent with Quantum's claim that the earlier assignment from A.C.N. 120 to Quantum transferred rights in the '810 patent. In an attempt to explain this striking inconsistency, Quantum makes the remarkable claim that Rocksoft's December 24, 2007 assignment "was an unnecessary step simply taken to further highlight the

1  chain of title that already existed[]" and "should now be disregarded."  (*See* Plaintiff Quantum's
2  Opposition to Defendant Riverbed's Motion to Enter a Protective Order and Stay Discovery
3  ("Opp.") at 1, Docket No. 43.)

4        *Second*, Quantum contends that even if the exclusive license from A.C.N. 120 to
5  Quantum did not transfer rights in the '810 patent, Quantum nevertheless has constitutional
6  standing to assert infringement of the '810 patent because Quantum has "exclusive control" of the
7  '810 patent.  In support of this argument, Quantum relies on an errant district court decision first
8  identified as such by Riverbed in its motion to dismiss – *Atmel Corp. v. Authentec, Inc.*, 490 F.
9  Supp. 2d 1052 (N.D. Cal. 2007).  The *Atmel* decision is wrong and should not be followed by this
10 Court because it finds that when a parent corporation exercises exclusive control over a
11 subsidiary's patent it has constitutional standing **even in the absence of a written agreement**.  The
12 *Atmel* holding contradicts Federal Circuit precedent and the Patent Act, which require exclusive
13 licenses to be in writing to confer standing.  Furthermore, Quantum has failed to demonstrate that
14 it has standing even under the erroneous *Atmel* standard.

15       Quantum has the burden of establishing it has standing to sue for infringement of
16 the '810 patent.  *See Ortho Pharm. Corp.* v. *Genetics Inst., Inc.*, 52 F.3d 1026, 1032-33 (Fed. Cir.
17 1995) (burden of establishing standing falls on the party asserting that it exists).  Because
18 Quantum has failed to meet that burden, Quantum's patent infringement claims should be
19 dismissed.

20 **II.    THE LICENSE BETWEEN A.C.N. 120 AND QUANTUM DID NOT TRANSFER
        RIGHTS IN THE '810 PATENT FROM ROCKSOFT TO QUANTUM**
21
       **A.    Rocksoft Was Not A Signatory To The License Between A.C.N. 120 And
22         Quantum**

23       Quantum now claims that it had standing because the August 13, 2007 license from
24 A.C.N. 120 to Quantum transferred rights in the '810 patent directly from Rocksoft to Quantum.
25 Quantum claims that this transfer occurred because this license applied to A.C.N. 120 "and its
26 subsidiaries" and Rocksoft is a subsidiary of A.C.N. 120.  Even assuming that Rocksoft was a
27 subsidiary of A.C.N. 120, Quantum's theory fails because Rocksoft **did not sign** the license
28 between A.C.N. 120 and Quantum (a fact that Quantum fails to mention in its opposition brief).

That license was only signed by representatives from A.C.N. 120 and Quantum.  (Briggs Decl., Ex. D at QU 000226.)  Indeed, the license never even mentions Rocksoft by name.  Rocksoft could not have granted a license to the '810 patent through an agreement it did not sign.

### B. A.C.N. 120 Did Not Have The Authority To Assign Rocksoft's Property To Quantum

Assuming Quantum recognizes that Rocksoft did not sign the August 13, 2007 license, Quantum may be contending that A.C.N. 120 somehow had the authority to assign property owned by its subsidiary, Rocksoft, to Quantum.  Quantum admits that A.C.N. 120 and Rocksoft are separate corporate entities.  The Federal Circuit has recognized that the separate legal status of related corporate entities – like A.C.N. 120 and Rocksoft – must be adhered to, and that a relationship through a common owner does not allow this court to ignore their legal separateness.  *See Poly-America L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004).[1]  Furthermore, although Quantum may suggest that A.C.N. 120 had the right to transfer Rocksoft's property at will, Quantum provides no evidence showing that Rocksoft gave A.C.N. 120 the authority to assign or license the '810 patent to others.  Quantum has not, for example, produced a single document or provided any testimony showing that the board of directors of Rocksoft gave A.C.N. 120 the authority to make such an assignment.[2]

---

[1] As the Federal Circuit observed in *Poly-America* in refusing to allow one subsidiary corporation from recovering damages allegedly incurred by a sibling corporation, "*Poly-America and Poly-Flex have a common parent corporation and are not simply divisions of a single corporation, but are separate corporate entities.  Their parent has arranged their corporate identities and functions to suit its own goals and purposes, but it must take the benefits with the burdens.*  While we do not speculate concerning the benefits that the two companies reap from dividing their operations and separating the owner of the patent from the seller of the patented product, Poly-America and Poly-Flex may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure—in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee." *Poly-America*, 383 F.3d at 1311 (emphasis added).  Like Poly-America, Quantum should not be permitted to enjoy the advantages of its separate corporate structure from A.C.N. 120 and Rocksoft while at the same time avoiding the limitations inherent to that structure.

[2] It would also be improper to "reverse pierce" Rocksoft's corporate veil, thereby permitting A.C.N. 120 to stand in Rocksoft's shoes and license away rights to its intellectual property without consent or authorization.  Piercing the corporate veil is a judicially created tool used to prevent corporations from skirting the law through fraud or other malfeasance.  9 B. E. WITKIN, SUMMARY OF CALIFORNIA LAW, CORPORATIONS, § 9 (10th ed. 2005).  Accordingly, it is inappropriate for it to be used to enable a corporation to circumvent established corporate law.  *See Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112,
   (footnote continued)

C. **Under The Patent Act, Any Exclusive License To The '810 Patent Must Be Signed By The Patent Owner – Rocksoft**

The Patent Act requires exclusive licenses to be in writing and signed by the owner of the patent. *See Enzo APA & Son v. Geapag A.G.*, 134 F.3d 1090, 1093 (quoting 35 U.S.C. § 261). Under Section 261 of the Patent Act, "[a]pplications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States." 35 U.S.C. § 261 (2006). This section makes clear that exclusive licenses to patents must be "in writing" and that only the "applicant, patentee, or his assigns or legal representatives" can grant and convey such exclusive licenses. *Id*. Because A.C.N. 120 is neither the applicant, the patentee, the assignee nor a legal representative of the foregoing, it could not grant an exclusive license to the '810 patent to Quantum under 35 U.S.C. § 261.

D. **The December 24, 2007 Assignment From Rocksoft To A.C.N. 120 Undermines Quantum's Contention that A.C.N. 120 Could Unilaterally License Rocksoft's '810 Patent**

After Riverbed exposed a gap in the chain of title between Rocksoft and A.C.N. 120 in early December, Quantum agreed to supplement its interrogatory response relating to standing by December 24, 2007. On that day, Quantum supplemented its interrogatory response and produced an assignment from Rocksoft to A.C.N. 120. ***This assignment was executed on December 24, 2007, the same day Quantum produced it to Riverbed.*** The very existence of this assignment is further proof that the license from A.C.N. 120 to Quantum did not transfer any rights in the '810 patent to Quantum before the patent infringement suit was filed.

When Riverbed pointed out that this assignment could not confer retroactive standing as a matter of law, Quantum shifted to its latest theory that Rocksoft licensed the '810 patent to Quantum through the A.C.N. 120 to Quantum license. Realizing that this new theory

---

123 n.10 (D.D.C. 1999) ("Furthermore, the law generally does not allow the option of 'reverse piercing' the corporate veil when it suits the corporation's owner."); *see also* 1 WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41.70 (rev. ed. 1999).

was inconsistent with the December 24, 2007 assignment, Quantum now makes the remarkable claim that: "The assignment dated December 24, 2007 . . . was not essential to Quantum's right to file this action as exclusive licensee, and was an unnecessary step simply taken to further highlight the chain of title that already existed. *It can and should now be disregarded because it is not necessary to demonstrate Quantum's standing*, as explained above." (Opp. at 1.)

Quantum's explanation is disingenuous and transparent. Quantum provides no evidence in the form of a declaration or otherwise to supports its explanation. Furthermore, the plain language of the December 24 assignment contradicts Quantum's explanation. Rocksoft states in the assignment that it "represents and warrants that it *has not granted* and will not grant to others any rights inconsistent with the rights granted by this Assignment." (Briggs Decl., Ex. H (emphasis added).) This signed statement by Rocksoft – the apparent owner of the '810 patent – shows that it had not granted any rights that would amount to an assignment or an exclusive license with all substantial rights prior to December 24, 2007.

### III. QUANTUM DOES NOT HAVE STANDING TO SUE FOR INFRINGEMENT OF THE '810 PATENT UNDER *ATMEL*

Quantum alternatively argues that even if the license between A.C.N. 120 and Quantum did not transfer rights in the '810 patent to Quantum, Quantum nevertheless has constitutional standing to assert infringement of the '810 patent because Quantum has "exclusive control" of that patent and as such should be "allowed to remedy any defects in its 'prudential standing' after the complaint has been filed." (Opp. at 4.) Quantum relies on the errant *Atmel Corp. v. Authentec, Inc.*, 490 F. Supp. 2d 1052 (N.D. Cal. 2007) decision to support its theory. As explained below, the *Atmel* decision is contrary to both well-established Federal Circuit precedent and 35 U.S.C. § 261 and should not be followed by this Court.

#### A. The Holding in *Atmel* Is Contrary To Federal Circuit Precedent And the Patent Act

First, *Atmel* is wrong as a matter of law because it holds that a parent corporation can have "constitutional" standing as an exclusive licensee to sue for infringement of a patent owned by one of its subsidiaries *in the absence of a written agreement* transferring rights in that patent from the subsidiary to the parent.

It is well-established under Federal Circuit law that a plaintiff must have "constitutional" and "prudential" standing to sue for patent infringement. *Propat Int'l Corp. v. Rpost US, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007). Legal owners of patents and exclusive licensees with all substantial rights in a patent can bring suit in their own name and are deemed to have constitutional and prudential standing. *Id*. On the other hand, exclusive licensees that do not have all substantial rights in a patent are considered to have constitutional standing, but must join the patent owner in the lawsuit to gain prudential standing. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). Non-exclusive licensees, by contrast, have "no constitutional standing . . . to bring suit or even join a suit with the patentee because a nonexclusive (or 'bare') licensee suffers no legal injury from infringement." *Id*.

Directly contrary to the holding in *Atmel*, for an exclusive license to confer standing on a licensee, whether that exclusive license grants all substantial rights or not, it must be in writing. *See Enzo*, 134 F.3d at 1090-94. In *Enzo*, the Federal Circuit stated:

> While we acknowledge that a license may be written, verbal, or implied, ***if the license is to be considered a virtual assignment to assert standing, it must be in writing***. The limited exception we have provided conferring standing on licensees is restricted to virtual assignees. As such, the licensing arrangement conferring such must, logically, resemble an assignment in both form and substance. Under the 35 U.S.C. § 261 (1994), '[a]pplications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.' If we were to expand the exception to include verbal licenses, the exception would swallow the rule. Parties would be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261 by claiming to be patentee by virtue of a verbal licensing arrangement.

*Id*. at 1093 (emphasis added). As the Federal Circuit recognized in *Enzo*, an excusive licensee cannot have standing under Section 261 of the Patent Act unless the exclusive license is in writing. Accordingly, implied or verbal licenses ***cannot*** confer constitutional standing.

A recent decision from the Eastern District of Texas rejects *Atmel* and correctly recognizes that constitutional standing requires a written agreement. In *GraphOn Corp. v. AutoTrader.com, Inc.*, No. 05-CV-530 (E.D. Tex. Nov. 16, 2007) (Ward, J.), GraphOn, the plaintiff, argued that, even though there was no written agreement, it was "at least an exclusive

licensee with substantial rights in the Patents-in-suit" because it had "the right to practice the patented inventions, the exclusive and unrestricted right to license others, and the exclusive and unrestricted right to enforce the patents, including the right to bring suit," "GraphOn NES [the patent owner] retained no rights to the patents," and "GraphOn had complete ownership and control of GraphOn NES at the time of the assignment of the patents to GraphOn NES, and at all times thereafter." (*See* GraphOn's Opposition to AutoTrader.com's Motion to Dismiss for Lack of Subject Matter Jurisdiction at 4-5, Briggs Supp. Decl., Ex. A.)  GraphOn expressly cited *Atmel* to support its argument.  (*Id.* at n.4.)

Judge Ward rejected GraphOn's contention that it had constitutional standing citing *Enzo* and dismissed GraphOn's patent infringement claims:

> The plaintiff, however, ***does not provide any evidence of a written agreement between GraphOn Corp. and GraphOn NES Sub LLC*** (the undisputed owner of the patents at the time this case was filed). *See Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 ("While we acknowledge that a license may be written, verbal, or implied, if the license is to be considered a virtual assignment to assert standing, it must be in writing.").

(*See* Order of Dismissal Without Prejudice, Briggs Supp. Decl., Ex. B (emphasis added).)

*Atmel* also contradicts the Federal Circuit's decision in *Schreiber Foods v. Beatrice Cheese, Inc.*, 402 F.3d 1198 (Fed. Cir. 2005).  In *Schreiber*, the parent corporation, Schreiber, assigned a patent it owned to its subsidiary, Schreiber Technologies, during a lawsuit. *Schreiber*, 402 F.3d 1202-03.  The subsidiary then gave the parent a non-exclusive license to the patent. *Id*. The assignment was apparently executed to avoid state income taxes. *Id*. at 1200.  The Federal Circuit held that the parent lost constitutional standing as a result of the assignment:

> At the time this action commenced, Schreiber was the owner of the '860 patent and had standing.  However, ***once the assignment to Schreiber Technologies was completed, there was no question that Schreiber lost its "personal stake in the outcome."***  Though an assignment of a patent does not ordinarily include the right to sue for past infringement, . . . the assignment to Schreiber Technologies explicitly included an assignment of all causes of action.  It is well-settled that non-exclusive licensees do not have constitutional standing to sue. ***Thus, when Schreiber transferred the '860 patent and became a mere non-exclusive licensee [of its subsidiary's patent], <u>Schreiber lost standing to sue for infringement and the case became moot</u>***.

*Id*. at 1202-03 (emphasis added) (citations omitted).  Notably, the Federal Circuit found that the parent corporation did not have standing even though it recognized that the transfer of the patent to the subsidiary was apparently done solely for tax purposes.  *See id.* at 1200-03.  Under these facts, there is no question that the parent retained "exclusive control" over its subsidiary's patent, yet the Federal Circuit unequivocally held that the parent lost standing despite having a non-exclusive license.  *Atmel* is entirely inconsistent with the Federal Circuit's holding in *Schrieber*.[3]

The *Atmel* decision is also contrary to numerous other district court decisions that have found parent corporations lack standing to sue for infringement of their subsidiaries' patents in the absence of a written assignment or exclusive license.  *See Site Microsurgical Sys., Inc. v. Cooper Cos., Inc.*, 797 F. Supp. 333, 337-38 (D. Del. 1992) ("The Court is not convinced, and the plaintiff offers no authority, that a parent corporation effectively has the patent rights of owners, assignees, and licensees by virtue of its ownership of a subsidiary holding the patent."; "While [the parent corporation] may have an interest at stake in the suit, [it] does not claim to hold legal title to the patents at issue and, thus, it has no standing to sue for patent infringement."); *Merial Ltd. v. Intervet Inc.*, 430 F. Supp. 2d 1357, 1362 (N.D. Ga. 2006) (parent-licensee did not have standing to sue where patent owned by subsidiary); *Lans v. Gateway 2000, Inc.*, 84 F. Supp. 2d 112, 123 (D.D.C. 1999) (plaintiff did not have standing to sue where he assigned patent to corporation of which he was sole shareholder and managing director ); *see also Beam Laser Sys., Inc. v. Cox Comms., Inc.*, 117 F. Supp. 2d 515, 520-21 (E.D.Va. 2000) (sole shareholder did not hold equitable title in patent owned by corporation and therefore did not have standing to sue for equitable relief).

Judge Posner also found that a parent corporation does not have standing to sue for infringement of a patent owned by its subsidiary. *DePuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1239 (N.D. Ill. 2005) (Posner, Cir. J., sitting by designation) (named plaintiff lacked standing where subsidiary owned patent).  Judge Posner explained that: "[T]he commission

---

[3] It does not appear that the *Atmel* court considered *Schrieber* since that decision does not address or cite *Schrieber*.

of a tort or other wrong (patent infringement is a statutory tort) against a corporation is not infringement of a legally protected interest of its parent corporation[]." *Id.* Allowing Quantum to sue for an alleged injury to Rocksoft is like allowing "someone who owned all the stock of a corporation [to] sue for redress of a tort committed not against him but against the corporation, and that is not permitted." *Id.* at 1238.

Quantum has also failed to identify any Federal Circuit cases holding that an exclusive license that confers constitutional standing can be implied by virtue of a corporate parent/subsidiary relationship. In fact, the Federal Circuit cases cited in Quantum's opposition, *Propat Int'l Corp. v. Rpost US, Inc.*, 473 F.3d 1187 (Fed. Cir. 2007), *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016 (Fed. Cir. 2001), and *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870 (Fed. Cir. 1991) support Riverbed's position, not Quantum's. In *Propat* and *Mentor*, the Federal Circuit held that the purported exclusive licensee ***did not*** have standing to sue in its own name even though there was a pre-complaint written agreement between the patent owner and the licensee. *Propat*, 473 F.3d at 1194 (Fed. Cir. 2007); *Mentor*, 240 F.3d at 1017-18 (Fed. Cir. 2001). In *Vaupel*, the Federal Circuit found standing based on ***pre-filing written agreements*** between the ***owner of the patent*** (the named inventor) and the plaintiffs which transferred all substantial rights under the patent to the plaintiffs. *Vaupel*, 944 F.2d at 873-76 (Fed. Cir. 1991). Here, Quantum concedes there was no written agreement directly transferring any rights from Rocksoft to Quantum at the time its complaint was filed.

With its standing theories, Quantum seeks to excessively broaden the "limited exception [the Federal Circuit] has provided conferring standing on licensees" to include any parent company that "exercised control" over any patent of any of its subsidiaries. *See Enzo*, 134 F.3d at 1093. To permit this would, as the Federal Circuit warned, "swallow the rule" because "[p]arties would be free to engage in revisionist history, circumventing the certainty provided by the writing requirement of section 261 [of the Patent Act]" merely by claiming to have last had "control" of the patent. *Id.* Quantum should not be permitted to circumvent the writing requirement of 35 U.S.C. § 261.

### B. Even Under *Atmel*, Quantum Has Not Established That It Has Standing

Although Riverbed believes that *Atmel* is contrary to controlling Federal Circuit precedent and 35 U.S.C. § 261, the facts of this case are easily distinguishable from those in *Atmel*. Thus, even if *Atmel* were good law, Quantum would still lack standing.

The *Atmel* court concluded that "Atmel Corporation [the parent] had constitutional standing as an exclusive licensee at the inception of the case" because it had "*always* acted as the exclusive licensee of the" subject patent. *Atmel*, 490 F. Supp. 2d at 1055 (emphasis added). In finding that the parent had "always acted as the exclusive licensee," the court relied on several key facts that are not present here. First, the court found that "Atmel Corporation [the parent] has always been the only entity that practices and enforces the patent in the United States." *Id*. Here, Quantum's verified interrogatory responses show that Quantum has not always been the only entity that practices and enforces the patent in the United States. Quantum's responses show that Rocksoft was extensively involved in selling software that practices the claims of the '810 patent. Quantum's response states that Rocksoft has contacted at least the following companies "about reselling software which embodies the '810 patent" including Symantec Corporation (Cupertino, CA), EDS Information Services LLC (Plano, TX), Computer Associates International, Inc. (Islandia, NY), EMC Corporation (Southboro, MA), Veritas (Mountain View, CA), Network Appliance (Sunnyvale, CA), FalconStor Software, Inc. (Mellville, NY), EDI Ltd. (Nachua NH), Adaptec (Milpitas, CA), Microsoft (Redmond, WA), Copan Systems (Longmont, CO), Acopia (Lowell, MA), StorageSwitch, LLC (Boulder, CO), Agami (Sunnyvale, CA), Tektools (Dallas, TX), Seagate (no address provided), HDS (no address provided), SUN (no address provided), and MySpace (no address provided). (*See* Quantum Corporation's Second Set of Supplemental Responses To Riverbed Technology Inc.'s First Set Of Interrogatories, Briggs Supp. Decl., Ex. C at 12-13.) Moreover, these verified responses show that Rocksoft and ADIC were both involved in patent licensing discussions with Hewlett Packard Company and that Rocksoft granted individuals at U.C. Santa Cruz "permission to use U.S. Pat No. 5,990,810 for noncommercial academic and educational research activity" in 2005. (*Id*. at 9-10.) Clearly, Quantum has not always been the only entity that practices and enforces the '810 patent in the United States.

Second, the *Atmel* court found that "there is no evidence to suggest that either Atmel Grenoble or Atmel Switzerland [the subsidiaries] has ever granted rights in the '114 patent to any party other than Atmel Corporation [the parent]." *Atmel*, 490 F. Supp. 2d at 1055. Here, Quantum admits that Rocksoft granted rights in the '810 patent to individuals at U.C. Santa Cruz and that Rocksoft had attempted to license the '810 patent to Hewlett Packard Company. (Briggs Supp. Decl., Ex. C at 9-10.)

Finally, the court found that "It is clear from the evidence presented that Atmel Corporation has always had the implicit right to make, use and sell the patented invention and to control the enforcement of the patent rights." *Atmel*, 490 F. Supp. 2d at 1055. The plaintiff in *Atmel* submitted evidence in the form of two declarations supporting the fact that Atmel Corporation had always had the implicit right to make, use and sell the subject patent and to control the enforcement of the subject patent. (*See* Declaration of Michael D. Rounds in Support of GraphOn's Opposition to Autotrader's Motion to Dismiss, Briggs Supp. Decl., Ex. D.) Quantum could not and did not provide any equivalent evidence here. In fact, Quantum submitted a declaration from its general counsel, Shawn Hall, but Mr. Hall does not (and could not) state that Quantum has always had the implicit right to practice and enforce the '810 patent.

The facts in this case are similarly distinguishable from *Steelcase Inc. v. Smart Techs. Inc.*, 336 F. Supp. 2d 714 (W.D. Mich. 2004), a case relied on by the *Atmel* court. In *Steelcase*, the Michigan court found a direct parent corporation, Poly-Vision, "effectively had control" of a patent owned by its subsidiary, Greensteel, and that Poly-Vision "was essentially one and the same with Greensteel." *Steelcase*, 336 F. Supp. 2d at 718. The court stated: "Although there apparently was no written license agreement, PolyVision was the sole licensee of the patent, Greensteel permitted PolyVision to exclusively practice the patent, and Greensteel granted PolyVision the right to enforce the patent." *Id*. Here, the evidence shows that Quantum is not the sole licensee of the '810 patent: Rocksoft licensed and attempted to license the patent to other companies including Hewlett Packard. (Briggs Supp. Decl., Ex. C at 9-10.) Furthermore, the evidence shows that Rocksoft permitted numerous other companies to use software that practiced the '810 patent. (*Id*. at 12-13.) Quantum also has not submitted any evidence showing that

Rocksoft granted Quantum the right to enforce the '810 patent. In fact, the December 24, 2007 assignment from Rocksoft to A.C.N. 120 states that "Assignor [Rocksoft] represents and warrants that it ***has not granted*** and will not grant to other any rights inconsistent with the rights granted by this Assignment." (Briggs Decl., Ex. H.) Rocksoft's representation that it "has not granted" any rights inconsistent with the December 24 assignment to A.C.N. 120 proves that Quantum did not have exclusive rights to the '810 patent before December 24, 2007.

## IV.  ANY DOUBT IN QUANTUM'S STANDING SHOULD BE RESOLVED IN FAVOR OF DISMISSAL

The parties and the Court have a substantial interest in seeing that this case does not move forward into time-consuming and expensive proceedings under the cloud of a standing defect. Quantum itself has implicitly acknowledged that a standing defect exists through its production of the December 24, 2007 assignment from Rocksoft to A.C.N. 120. Furthermore, Quantum's standing theories are not supported by Federal Circuit law, Section 261 of the Patent Act, or the facts as explained above. Under these circumstances, there is a considerable risk that this case could proceed through years of expensive litigation only to be overturned by the Federal Circuit. Should this happen, the entirety of that effort would be completely erased. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774 (Fed. Cir. 1996) (vacating a judgment after full trial on merits because a standing defect existed). Consequently, any doubt as to whether Quantum has standing should be resolved in favor of granting Riverbed's motion to dismiss.

## V.  CONCLUSION

Riverbed respectfully requests that the Court grant its motion and dismiss Quantum's patent infringement claims under the '810 patent. Because Quantum does not dispute that it is also proper to dismiss Riverbed's counterclaims for declaratory judgments of non-infringement and invalidity of the '810 patent and to proceed in this action with Riverbed's patent infringement claims against Quantum under the '249 patent should its motion to dismiss be granted, Riverbed respectfully request that the Court enter an appropriate order to that effect.

Dated: January 24, 2008

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

/s/ Claude M. Stern
Claude M. Stern
Attorneys for Defendant and Counterclaimant,
RIVERBED TECHNOLOGY, INC.