# EXHIBIT 1

080131QuantumWHAF.txt

Pages 1 - 25

United States District Court

Northern District of California

Before The Honorable William Alsup

Quantum Corporation,              )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )        No. C07-4161 WHA
                                  )
Riverbed Technology,              )
Incorporated,                     )
                                  )
            Defendant.            )
_____   )

                        San Francisco, California
                        Thursday, January 31, 2008

            Reporter's Transcript Of Proceedings

Appearances:


For Plaintiff:          Sheppard, Mullin, Richter & Hampton
                        12275 El Camino Real, Suite 200
                        San Diego, California  92130
                    By: Mauricio Flores, Esquire
                        Amardeep Lal Thakur, Esquire



For Defendant:          Quinn Emanuel Urquhart Oliver & Hedges
                        555 Twin Dolphin Drive, Suite 560
                        Redwood Shores, California  94065
                    By: Claude M. Stern, Esquire
                        Todd Michael Briggs, Esquire



Reported By:            Sahar McVickar, RPR, CSR No. 12963
                        Official Reporter, U.S. District Court
                        For the Northern District of California

            (Computerized Transcription By Eclipse)
                                                        2
 ⬚

 1   Thursday, January 31, 2008                    8:00 a.m.

 2                   P R O C E E D I N G S

 3           THE CLERK:  Civil action number C07-4161, Quantum

 4   versus Riverbed Technology.

 5           THE COURT:  Well, who do we have?

 6           MR. FLORES:  Mauricio Flores and Amardeep Thakur on

 7   behalf of plaintiff, Quantum.

 8           MR. STERN:  Good morning, Your Honor.

 9           Claude Stern and Todd Briggs of Quinn Emanuel on

10   behalf of Riverbed.

11           Mr. Briggs will be arguing the motion.

080131QuantumWHAF.txt

12          THE COURT:  Okay.

13          This is a motion by Riverbed; that's Riverbed over

14  here?

15          MR. BRIGGS:  Yes.

16          THE COURT:  Okay.  It's your motion, so go ahead.

17          MR. BRIGGS:  Thank you, Your Honor.

18          First off, I would just like to say that I

19  appreciate your order from last week requesting that the junior

20  associates be given an opportunity to argue before you.

21          THE COURT:  Well, are you a junior associate?

22          MR. BRIGGS:  I'm a senior associate, but I'm more

23  junior.

24          THE COURT:  Closer to what I wanted than Mr. Stern.

25          MR. BRIGGS:  By many years.  By many years, yes.

                                                              3


1           Thank you.

2           THE COURT:  I'll make my speech again; I worry for

3   the future.  After Mr. Stern is long gone and has retired to

4   his 50-acre ranch on the Big Island in Hawaii and all the rest

5   of you are gone, I worry for the future of our federal system,

6   because we are not training a generation to come behind them.

7   And in order to train them, in order for this public to have

8   confidence in our system, it's more important, really, that we

9   have good lawyers than good judges.  You need a good judge, but

10  the lawyers are more than two-thirds of the process.

11          And if the public does not have confidence that the

12  system works, they will say, oh, let's go to JAMS, oh, let's

13  get a mediator, we can't trust a jury.  And the real reason is

14  going to be because the lawyers are afraid and unable to do it.

15          And in order to -- big firms are up against clients

16  that insist on Mr. Big or Ms. Big, and somehow the profession

17  has got to address this issue.  I'm not going to solve it by

18  myself, but I'm going to do my little piece of it.

19          Now, I want to assure you it will make no difference

20  in the outcome of this motion who argues it, that is a separate

21  point.  I -- that's not going to be a factor.  So I just make

22  that point for all of you to think about as you go forward with

23  your careers and wonder about the future of our system.

24          All right, enough said on my preaching, let's go to

080131QuantumWHAF.txt

25    your motion.

                                                                    4


1            MR. BRIGGS:  Okay.

2            I would like to get right to the question that you

3    presented to us earlier this week, and that is, under the

4    applicable law does a parent company automatically have

5    authority to act as agent to transfer assets of its

6    subsidiaries.  And we think under any law that would apply to

7    this case, the answer to that is clearly no.

8            THE COURT:  What law does apply to this issue?

9            MR. BRIGGS:  Well --

10           THE COURT:  Let me give you three possibilities.

11           MR. BRIGGS:  Well, there is --

12           THE COURT:  Federal common law, Australia law, maybe

13    California law, maybe something else.

14           MR. BRIGGS:  Right.

15           THE COURT:  What law does apply to this issue?

16           MR. BRIGGS:  Well, you know, ACN120 and Rocksoft,

17    they are both Australian companies, so if you were looking at

18    an agency theory, if you are determining if one Australian

19    company can act as an agent of another Australian company, it

20    very well may be Australian law.  But it could be federal law

21    or it could be California law.  We haven't had an opportunity

22    to fully research that issue yet, so I'm not sure, exactly

23    which law.

24           THE COURT:  It is your motion.

25           MR. BRIGGS:  That is correct, but --

                                                                    5


1            THE COURT:  So you know, here we are at the time and

2    place to stand and deliver.  And I'm not giving anybody more

3    opportunity to do anything.

4            MR. BRIGGS:  Well, the answer is we have done some

5    research after receiving your question under each of those

6    bodies of law, and the answer is no, under each of the -- under

7    each body of law.

8            THE COURT:  Okay, well, lay it on me, as they say,

9    and tell me what the -- tell me each body of law, and then tell

10    me what the -- what you are relying on.

11           MR. BRIGGS:  Sure.

080131QuantumWHAF.txt

12          It's a basic tenet of corporate law here in the

13  United States and in Australia that corporations are separate

14  legal entities.  They own their own property, and they act --

15  they act independently of one another.  One corporation, just

16  because it owns shares of another corporation, does not mean it

17  has legal title to the assets of that corporation and it can do

18  what it wants with that.  And I have a Supreme Court case that

19  states that, Dole versus Patrickson, 538 US 468 from 2003.

20          And it says here, "A corporate parent which owns the

21  shares of a subsidiary does not for that reason alone own or

22  have legal title to the assets of the subsidiary.  And it

23  follows with even greater force that the parent does not own or

24  have legal title to the subsidiaries of the subsidiary."

25          I have a similar statement under California law.

                                                              6

1   This is from Northwest Pacific Railroad versus the State Board

2   of Equalization, 21 Cal 2d, 524.  The quote from the case:

3   "Ownership of capital stock in one corporation by another does

4   not itself create an identity of corporate interest between the

5   two companies nor render the stock holding company the owner of

6   the property of the other nor create the relation of principle

7   and agent, representative or alter ego between the two."

8           We also contacted counsel in Australia and corporate

9   counsel in Australia and got a similar answer.  Here is a case

10  from -- from Australia, a quote from the case is, "I say that

11  because each of those five matters relate to control, and

12  control of itself cannot be a decisive indicator of agency.  If

13  it were otherwise, there would be -- there would often be an

14  agency between a parent company and its subsidiary or a sole

15  shareholder and his company.  Such a result is not only

16  inconsistent with Solomon V. Solomon and co-limited, but also

17  with the high court authority, which recognizes this separate

18  legal existence of companies in a group."  That is from

19  ACN007528207 Party Limited versus Bird Cameron Partners.

20          We also found that this is true under Delaware law,

21  if Delaware law were somehow found to apply to this action.  So

22  all the authorities are -- are consistent.  Any authority that

23  would apply in this case is consistent, and it says that the

24  property of a subsidiary is not -- it's not owned by the

                           Page 4

080131QuantumWHAF.txt

25    shareholders of the parent corporation.

7

1              And so the answer to your question is no.  I mean,
2    if the shareholders -- even if it was a sole shareholder who
3    tried to transfer the assets, the board of the subsidiary
4    corporation would have the legal power to block that.  So there
5    is no automatic authority to just transfer assets of a
6    subsidiary.
7              THE COURT:  Have you read the motion to supplement
8    the record that was made by the plaintiff?  It was filed -- a
9    supplemental declaration?
10             MR. BRIGGS:  Yes.
11             THE COURT:  What's your response to that?
12             MR. BRIGGS:  Well, I don't think that solves any
13   problems here.  That just says that -- that is signed by
14   Shawn Hall.  Now, Shawn Hall is apparently the C -- not the
15   CEO, but the general counsel of Quantum Corporation, so he
16   wears that hat.  Apparently, he is also a director in ACN120
17   and a director in Rocksoft, along with several other directors.
18   I think Rocksoft has a total of four directors and ACN120 has
19   three directors.
20             First of all, my first response to it is is that
21   whole declaration is based on an inadmissible hearsay
22   statement.  He claims that the CEO of Quantum told him to
23   transfer all substantial rights in the '810 patent before the
24   filing of this lawsuit, to transfer those rights to Quantum.
25   Now, even if that were true, I don't believe he has the power,

8

1    acting alone, to do so.  There is no evidence that any of these
2    other directors knew of this, any of the other directors at
3    Rocksoft or any of them consented to this.  There is no
4    evidence of what the bylaws of Rocksoft are and whether he
5    could unilaterally do this on his own.  There is just no
6    evidence.  They haven't put forth any of that evidence.  And it
7    was their burden on this motion to show they had standing and
8    they didn't meet it.
9              So you know, based on the record, I don't think you
10   can deduce that he had the authority to do anything on behalf

Page 5

080131QuantumWHAF.txt

11  of Rocksoft and transfer any of their assets.

12          THE COURT:  Let me ask a different question.

13          You have a counter-claim in this case.

14          MR. BRIGGS:  That's correct.

15          THE COURT:  If the Court grants this motion so the

16  original complaint goes away, do the plaintiffs have the right,

17  in light of your counter-claim, to file a counter-claim to the

18  counter-claim and reassert all of the -- reassert the very same

19  patent now that they have possibly fixed it up with that

20  subsequent assignment?

21          MR. BRIGGS:  Well, first of all, we do have a

22  counter-claim.  And if you did dismiss their case, our

23  counter-claim would survive.  That was addressed in a Federal

24  Circuit case we cited in our opening brief.

25          THE COURT:  That's the problem.  That's why I'm
                                                                            9

1   raising it.

2           MR. BRIGGS:  And I do believe --

3           THE COURT:  I'm not saying what the answer would be,

4   but why are we going through this exercise if, and that is an

5   if, if it's easy enough to fix this just by filing a

6   counter-claim to the counter-claim?

7           MR. BRIGGS:  Well, they could file a counter-claim

8   to the counter-claim, but we have another action pending, we

9   have a declaratory judgment action pending in Delaware.  And

10  that would be the first filed action, and so we should be able

11  to proceed with that as the first filed action.

12          THE COURT:  Why don't you just agree that if I grant

13  this motion you will instantly dismiss your counter-claim and

14  reassert it wherever you want to so that all you go away and go

15  to Delaware?

16          MR. BRIGGS:  Well, I mean, we believe we would like

17  to move forward with our claim in this Court, and we believe we

18  can move forward with their claim in Delaware.  It provides a

19  strategic advantage for us in the litigation, I mean, to be

20  frank with you.

21          THE COURT:  I appreciate your frankness, but that's

22  why judges are almost fed up with patent lawyers who are always

23  trying to yank the courts around for some strategic advantage

080131QuantumWHAF.txt

24    when we got hundreds and hundreds of cases to deal with.  You

25    think about that.

                                                                    10

1             It would make it a lot easier to grant your

2     motion -- I'm going to grant the motion or deny the motion on

3     the merits, believe me, but I -- I wonder what the point is

4     if -- if, and I don't know what the answer to this

5     counter-claim to a counter-claim point is, but if it's as easy

6     to fix, they can just file a counter-claim because you filed a

7     counter-claim, that's not so easy to say that, well, the first

8     filed case in Delaware will be the one that goes forward.

9             Okay, thank you, Mr. Briggs.

10            MR. BRIGGS:  You're welcome.

11            THE COURT:  Let's hear from the other side.

12            MR. FLORES:  Good morning, Your Honor.

13            My name is Mauricio Flores.  I'm afraid I'm many

14    years past the lawyer you wanted, but I appreciate your

15    remarks.

16            THE COURT:  You are welcome, anyway.  I know that

17    you will take to heart my comments and do the right thing in

18    some other hearing.

19            All right, go ahead.

20            MR. FLORES:  Indeed, we will.

21            Your Honor, this case -- this motion isn't decided

22    on the broad proposition of law.  We don't assert, to be clear,

23    we do not assert that mere stock ownership gives one the right

24    to --

25            THE COURT:  Then what does?  Let's look at that

                                                                    11

1     August '07 -- see if I can find it again.

2             Let me get my law clerk to come up here.  Would you

3     come fish out the '07 --

4             I looked at it; look, here is the problem you have:

5     The guy that signs it signs it under a block that says ACN120,

6     it doesn't say Riverbed.

7             MR. FLORES:  That's correct.

8             THE COURT:  That's the whole problem you got.

9             MR. FLORES:  Yes.

10            THE COURT:  You did this one day before you filed

080131QuantumWHAF.txt

11  the lawsuit, and this was done in Australia.

12           This was more gimmickry by the patent lawyers in

13  this district -- or, actually, you are not even in this

14  district.  It was more gimmickry by patent lawyers to set up a

15  lawsuit.  And you did it too quick.

16           So I'm looking at the key page right here:  ACN10

17  signed by Sean somebody.  I'm going to assume for the sake --

18  record that he is also a director and officer of Rocksoft.

19           MR. FLORES:  He is.

20           THE COURT:  But he doesn't sign for Rocksoft, he

21  signs for ACN.

22           MR. FLORES:  It should have said Rocksoft.

23           THE COURT:  It should have.

24           MR. FLORES:  If you read the license --

25           THE COURT:  You are a big law firm.  These are big

                                                          12


1   sophisticated companies, and they come in saying, well, just go

2   with our intent.

3            MR. FLORES:  It's not just intent.  With respect,

4   Your Honor, I believe it is supported by the definition of the

5   licensor in the license.

6            THE COURT:  Yeah.  And it says and the subsidiaries.

7            MR. FLORES:  And also by the warranty in the

8   license.

9            THE COURT:  What if your neighbor says I hereby sign

10  away on behalf of myself and all of my neighbors all of their

11  houses on this street, you would be the first one to object and

12  say where did they get the authority to sign away my house.

13           MR. FLORES:  You bet I would.

14           THE COURT:  You would.  Just because they are

15  related corporations does not give them automatic authority to

16  do that.  And just because he happens to be on the boards of

17  both doesn't give him -- you know, I've seen cases where it's

18  the other way, where somebody says -- sometimes comes up in

19  cross-license agreements of what got cross-licensed, and they

20  say, oh, wait, that company never signed.

21           So sometimes this -- it makes a difference who

22  signs.  There is one signature here, and it purports to be on

23  behalf of ACN.  So that's problem you got.

                              Page 8

080131QuantumWHAF.txt

24              MR. FLORES:  Well, Your Honor, with respect, we

25  think that the license on its face clearly indicates an intent

                                                                    13

1  to bind Rocksoft by the definition and by the warrants made

2  herein.

3              THE COURT:  It indicates an intent to -- by ACN to

4  do so, true, not an intent by Rocksoft to do so.

5              MR. FLORES:  If that is Your Honor's opinion, then

6  let me point out that the particular facts of this case that I

7  think are really controlling are this:  Not only is there the

8  ownership of the stock, but there is composition of the

9  directors and there is the record of how this patent was

10  controlled by Quantum throughout.

11              The latter point I would refer you to our answer

12  Interrogatory No. 3, which is attached as an exhibit to

13  Mr. Briggs' declaration, I believe it's Exhibit G.  And that

14  response interrogatory makes it very clear that since Quantum

15  assumed these rights, it has asserted exclusive control over

16  the patent.

17              Furthermore, Quantum not only owned all the stock in

18  ACN120, but all of the directors, all of them, were either

19  officers or employees of Quantum.  ACN120 not only owned all

20  the stock of Rocksoft, but all the directors of Rocksoft were

21  officers and employees of Quantum and were also directors of

22  ACN.  I mean, for all practical purposes, we are not talking

23  about distinct companies.  And that is our position.

24              THE COURT:  I think perhaps you can make that

25  argument, but here is the difficulty:  If we were to go

                                                                    14

1  forward, and let's say you won or you lost, it almost wouldn't

2  matter.  We could build an entire edifice of litigation based

3  upon the assumption that we have standing, and the Federal

4  Circuit can say close the hymnal, stop the choir, sermon over,

5  this case should have never gone to square two.  And we would

6  have wasted all that effort.  So that is the risk that we are

7  up against if I rule for you, is that we are -- we are forever

8  at risk that this wasn't done right and the I's weren't dotted

9  and the T's weren't crossed.

080131QuantumWHAF.txt

10          I see the argument that you are making, I'm not

11  saying it's correct, and I sympathize with those lawyers who

12  with the simple thing of putting in another signature block

13  could have solved this problem then and there.  The same guy

14  could have signed for both.

15          MR. FLORES:  We could solve that problem, Your

16  Honor.

17          THE COURT:  No, you can't, you can't do it after the

18  fact.

19          MR. FLORES:  I would refer the Court to the Atmel

20  decision.

21          THE COURT:  I don't agree with Judge Wilken on that.

22  I read that case, I think she ignored Section 261.  And I

23  respectfully think that that case is problematic.

24          MR. FLORES:  Your Honor, may I address that point?

25          THE COURT:  Go ahead.

                                                          15



1           MR. FLORES:  I don't think there is any dispute

2  about the distinction between constitutional and prudential

3  standard, the standing.  And I don't think there is any dispute

4  about the rule that if you have constitutional standing then

5  you can remedy during the course of the litigation to acquire

6  prudential standing.

7           I think the Court should directly take a look at the

8  rules for constitutional inquiry.  Now, the technicalities

9  about you have to have your I's dotted and your T's crossed,

10  that may apply to completing transfers for acquiring both

11  prudential and constitutional, but the Article 3 test for

12  constitutional injury is a flexible and a practical standard.

13  Focusing on dotting I's and crossing T's is really

14  inappropriate in looking at that issue.

15          Here, under the facts of this case, given the

16  absolute control that Quantum has over its subsidiaries, given

17  the fact that these directorates are so interlocking and so

18  totally controlled by Quantum, that for all practical purposes

19  they are one in the same company.

20          You know, this patent, like all other patents,

21  stakes out ownership in some commercial space; there is no

22  doubt that Quantum Corporation controlled that commercial

080131QuantumWHAF.txt

23  space.  If you read the interrogatory response to Interrogatory

24  No. 3 attached to Mr. Briggs' declaration, it makes that

25  absolutely clear.  Since Quantum acquired these rights, it has

16

1   exercised control.  So the formalities that may govern the

2   first issue I think have no application in the constitutional

3   inquiry.

4           When there was infringement in this case, given the

5   identity of Quantum with its subsidiaries, when there was an

6   infringement in this case, it was Quantum that got hurt.  That

7   gives it constitutional injury in fact under Article 3.

8           Now, given -- I'm assuming that Your Honor is going

9   to rule that you disagree with us and that the actual transfer

10  of rights by -- on the part of Rocksoft was not effective; even

11  assuming that is the case, there was injury at Quantum, and

12  that, that supports allowing Quantum to remedy any defect in

13  its constitutional -- in its prudential standing during the

14  pendency of this litigation.

15          Now, Your Honor may disagree with the way those

16  principles were applied by Judge Wilken in the Atmel case, but

17  the fundamental rule that I just articulated I think is

18  nevertheless correct, and it's set forth in many of the cases

19  that are cited.  In fact, I don't even think it's really

20  disputed.

21          So I would urge the Court to confront directly the

22  question of Article 3 standing and to focus on that.  I mean,

23  the question there is a flexible one and a practical one.  That

24  is very clear from all the Supreme Court decisions, from Warth

25  v. Seldin in the '70s to Medimmune and Genentech just recently.

17

1   It's a practical inquiry, not a focus on dotting the I's and

2   crossing the T's.

3           As a practical matter, these entities, Quantum,

4   ACN120, Rocksoft, are one in the same.  And as a practical

5   matter, Quantum has controlled this patent.  That should

6   suffice to be an Article 3 injury in fact.  And that is why I

7   say that this case should not be decided on broad principles of

8   agency law, it should be decided on federal common law

9   standard, should be decided on flexible practical Article 3

080131QuantumWHAF.txt

10    inquiry.

11           Quantum has a personal stake in this case, not just

12    because it owns a stock of its subsidiaries.  Mere stock

13    ownership would not suffice.  It has a personal stake in this

14    case because of its absolute control over its subsidiaries to

15    the point that for all practical purposes they are

16    indistinguishable, they are one in the same entity.  It has a

17    personal stake because Quantum has absolutely controlled these

18    patent rights, because it is Quantum, as a practical matter,

19    that is being injured by this infringement.

20           So I don't think Your Honor has to agree with

21    everything in Atmel or how these principles were applied in

22    Atmel, I would urge the Court to just directly look at the test

23    for constitutional injury in fact.  And I believe that Quantum

24    Corporation here satisfies it, and that given the opportunity

25    to remedy any -- any technical issues about dotting I's and

                                                                    18


1     crossing T's we'll do so, and we should go forward.

2            There is no reason for this case to be in Delaware.

3     We've got two California corporations.  I believe, with all due

4     respect, that River --

5            THE COURT:  When did the infringement start, the

6     alleged infringement start?

7            MR. FLORES:  That I frankly don't know, Your Honor.

8            THE COURT:  Isn't there a six-year period for

9     Statute of Limitations?

10           MR. FLORES:  As far as damages goes, yes, Your

11    Honor.

12           THE COURT:  Has it been within six years?

13           MR. FLORES:  Yes, Your Honor.  And it certainly was

14    occurring at the time the complaint was filed.  That much I can

15    tell you.

16           THE COURT:  And if you did have to litigate this in

17    Delaware, you won't even lose any of the period of the Statute

18    of Limitations because you --

19           MR. FLORES:  No.

20           THE COURT:  You could file back there.  And so what

21    is the problem in litigating in Delaware?

22           MR. FLORES:  The problem, Your Honor, is first of

080131QuantumWHAF.txt

23  all, it's in Delaware, and there is no reason to seek an

24  inconvenient forum.  Delaware, to me, makes no sense.

25              THE COURT:  Inconvenient to them, too, I guess.
                                                                    19



1               MR. FLORES:  It would -- yes.

2               THE COURT:  So what is really turning on -- I mean,

3   I don't understand the strategies here.  What really turns --

4   even if it is inconvenient, what difference does it make

5   whether it's back there or here?

6               MR. FLORES:  Delay, Your Honor, delay.  I mean, I --

7   this, Your Honor, will push this case forward, I know that, the

8   parties know that.  We are going to proceed efficiently and

9   expeditiously to trial because you are going to require that.

10  We go to Delaware, we are going to start again from square one.

11  It's just going to be more delay and more expense.

12              That is really the only effect of going to Delaware.

13  This is -- that's why I believe it's the only reason I can

14  think of that Riverbed would file this motion.  And I think

15  that under the Article 3, under the flexible practical

16  standards the Supreme Court has always applied, there has

17  clearly been an injury to Quantum, and Quantum should be

18  allowed to remedy that.  And we should stay in this case before

19  Your Honor and proceed efficiently, taking advantage of all the

20  work we've done.

21              As you pointed out, these cases are difficult and

22  they are technical.  Packing up and moving it to Delaware is

23  going to be a lot of extra unnecessary expense and, even more

24  important, a lot of unnecessary delay.

25              THE COURT:  Well, one possibility is that I could
                                                                    20



1   just stay this entire case until the appeal got resolved.  Then

2   nobody's case would go forward.

3               MR. FLORES:  Your Honor, that is not a possibility

4   that Quantum wants to take advantage of.  We want to move

5   forward with the litigation.  We want to move forward in the

6   most expeditious way possible.  Quantum is not interested in

7   appeals.

8               The other possibility Your Honor raised is to give

Page 13

080131QuantumWHAF.txt

9  us leave to file a counter-claim to the counter-claim.

10          THE COURT:  Well, I don't know if that is authorized

11  by the Rules, but I'm not saying it's not.  But if it is

12  authorized by the Rules, then maybe there is -- maybe then you

13  just do that, and we are back to square one.

14          MR. FLORES:  Well --

15          THE COURT:  Except your damages period would be a

16  little different.  Probably doesn't even matter.

17          MR. FLORES:  We would be back to square one, in the

18  best sense of the word, because we would be back on this

19  Court's schedule, which we want to adhere to.

20          THE COURT:  All right, so sounds like what matters

21  here is the schedule.  You want -- probably what's going on

22  here is this side of the room knows that I will move the case

23  along, so they want their patent to be the one, they want their

24  offensive case to be the one that moves along and have your

25  offense case mired down in some other court somewhere else in

                                                              21

1  the country.  That is probably what is happening here.

2          And I don't mean any disrespect to any other court

3  in the country, not at all.  Everybody has to manage their

4  caseload the way they want, but sounds like that's what's

5  happening here.

6          MR. FLORES:  With respect to my colleagues, I

7  believe that to be the case.

8          THE COURT:  All right.  Thank you.

9          Mr. Briggs, do you want to respond?

10          MR. BRIGGS:  Sure.  Thank you.

11          He talked a lot about the constitutional injury --

12          THE COURT:  You should refer to him by name.

13          MR. BRIGGS:  Mr. Flores as the constitutional --

14          THE COURT:  One of the things about oral arguments

15  you must be exceedingly courteous to your opponent.

16          MR. BRIGGS:  Thank you.

17          THE COURT:  He has a name, refer to him by name.

18          MR. BRIGGS:  Mr. Flores talked a lot about the

19  constitutional injury point, and I would just like to direct

20  the Court's attention to a Federal Circuit case called

21  Schreiber.  Now, Schreiber completely undercuts their argument

080131QuantumWHAF.txt

22   that they had constitutional injury as a parent corporation.

23   In that case, the parent filed suit, and it owned the patent at

24   that time.  And during the course of the lawsuit, it assigned

25   the patent to a subsidiary.  And later on in the lawsuit, the          22



1   patent was transferred back to the parent.

2          But for the brief period of time when the parent had

3   assigned the patent to its subsidiary, the Federal Circuit held

4   that it had lost its complete stake in the -- in the action and

5   did not have constitutional standing.  So that -- that case

6   undermines his argument.  It undermines the Atmel case as well.

7          There is another District Court case where

8   Judge Posner was sitting by designation that is also very

9   interesting to constitutional injury point.  It is DePuy versus

10   Zimmer Holdings.  And that was the United States District Court

11   in Illinois, 2005, 384 F. Supp. 2d.  And he had a very similar

12   issue to what is going on here.

13          In that case, the patent at issue was owned by a

14   wholly-owned subsidiary of DePuy, and the parent argued that

15   since it owns the patentee, it suffered constitutional injury.

16   And there is a very interesting analysis done by Judge Posner

17   in that case, and he found that there was no constitutional

18   injury by the parent.

19          The third point I want to make here is that if the

20   transfer on August 13th from ACN120 to Quantum actually did

21   transfer rights in the patent, that -- that is -- is completely

22   undermined by the December 24th assignment from -- from

23   Rocksoft to ACN120.  Why would they need that assignment if the

24   patent had already been transferred?

25          THE COURT:  Well, belt and suspenders.  Insurance.          23



1   I think it recognizes there is an issue, but it doesn't

2   necessarily mean they were wrong the first time.  It draws into

3   question whether they were wrong, but it doesn't conclusively

4   prove they were wrong.

5          MR. BRIGGS:  Right.

6          Well, there is also language in that agreement that

7   states that they hadn't previously transferred any rights that

8   are inconsistent with that agreement.  So at that point in

080131QuantumWHAF.txt

 9  time, they were saying that we -- Rocksoft said that it had not

10  previously transferred any rights inconsistent with that

11  agreement.

12          THE COURT:  Okay.

13          Okay, here is what I want you to do, you should send

14  a letter or just make a filing by noon tomorrow, telling the

15  Court whether -- if this motion is granted the Court can also

16  dismiss your counter-claim; in other words, it would be deemed

17  voluntarily withdrawn such that there would be nothing left in

18  this court.

19          Now, I'm not saying that's a condition of granting

20  your motion, but I would like to know the answer to that before

21  I issue a ruling.

22          MR. BRIGGS:  Okay.

23          THE COURT:  So you make whatever call you want on

24  that, but ifs, but and maybes won't do any good.  So it's got

25  to be yes, we will, or no, we won't.

                                                                24

 1          All right, I want to thank you everybody for their

 2  efforts here.  And we'll get an order out probably on Monday or

 3  Tuesday, okay?

 4          MR. BRIGGS:  Thank you, Your Honor.

 5          MR. STERN:  Thank you very much, Your Honor.

 6          THE COURT:  All right.

 7          MR. FLORES:  Thank you, Your Honor.

 8              (Proceedings adjourned at 8:55 a.m.)

 9

10

11              ---oOo---

12

13

14

15

16

17

18

19

20

21

080131QuantumWHAF.txt

22

23

24

25
 

CERTIFICATE OF REPORTER


     I, Sahar McVickar, Official Court Reporter for the
United States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by me, a
certified shorthand reporter, and were thereafter transcribed
under my direction into typewriting; that the foregoing is a
full, complete and true record of said proceedings as bound by
me at the time of filing.  The validity of the reporter's
certification of said transcript may be void upon disassembly
and/or removal from the court file.


_____

     Sahar McVickar, RPR, CSR No. 12963
          February 5, 2008