AMAR L. THAKUR, Cal. Bar. No. 194025
MAURICIO A. FLORES, CAL. BAR NO. 93304
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
12275 El Camino Real, Suite 200
San Diego, California  92130-2006
Telephone:     858-720-8900
Facsimile:      858-509-3691
Email:  athakur@sheppardmullin.com
            mflores@sheppardmullin.com

NATHANIEL BRUNO, Cal. Bar. No. 228118
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
Four Embarcadero Center, 17th Floor
San Francisco, California  94111
Telephone:     415-434-9100
Facsimile:      415-434-3947
Email:  nbruno@sheppardmullin.com

Attorneys for Plaintiff, QUANTUM CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| RIVERBED TECHNOLOGY, INC., a Delaware corporation,<br><br>                 Counterclaimant,<br>     v.<br>QUANTUM CORPORATION,<br><br>                 Counterdefendant.<br><br>QUANTUM CORPORATION, a Delaware corporation,<br><br>                 Counterclaimant,<br>     v.<br>RIVERBED TECHNOLOGY, INC. a Delaware corporation,<br><br>                 Counterdefendant. | Case No. C 07-04161 WHA<br><br>The Hon. William H. Alsup<br><br>**QUANTUM CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Claim Construction Hearing:  July 9, 2008<br><br>Complaint Filed:  August 14, 2007<br>Trial Date:  March 30, 2009 |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

    A. The Fixed-Length Paradigm. ............................................................................. 1

    B. Dr. Williams Invents a Method for Using Data in the Block Itself to Partition Blocks of Data Into Variable-Length Subblocks. ................................ 3

II. ARGUMENT .................................................................................................................. 5

    A. The Legal Standards For Claim Construction. .................................................. 5

    B. "Subblock." ........................................................................................................ 5

    C. "Predetermined Constraint." .............................................................................. 8

    D. "Hierarchy" (Quantum); "An Additional Hierarchy of Subblocks is Formed from at Least One Group of Contiguous Subblocks" (Riverbed) ........................ 12

# TABLE OF AUTHORITIES

## Federal Cases

Brown v. 3M,
   265 F.3d 1349 (Fed. Cir. 2001) .................................................................................................. 13

Conoco, Inc. v. Energy & Envtl. Int'l,
   460 F.3d 1349 (Fed. Cir. 2006) .................................................................................................... 7

Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.,
   257 F.3d 1364 (Fed. Cir. 2001) ................................................................................................ 7, 9

Keithley v. The Homestore.com, Inc.,
   No. C03-04447, 2007 U.S. Dist. LEXIS 71126 (N.D. Cal. Sept. 12, 2007) ........................... 7, 9

Markman v. Westview Instruments, Inc.,
   52 F.3d 967 (Fed. Cir. 1995) ...................................................................................................... 11

N. Am. Vaccine, Inc. v. Nat'l Research Council,
   7 F.3d 1571 (Fed. Cir. 1993) ...................................................................................................... 11

Oakley, Inc. v. Sunglass Hut Int'l,
   316 F.3d 1331 (Fed. Cir. 2003) .................................................................................................. 11

Phillips v. AWH Corp.,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................................................... 5, 11, 12

Seachange Int'l, Inc. v. C-COR Inc.,
   413 F.3d 1361 (Fed. Cir. 2005) ................................................................................................ 7, 9

Verizon Servs. Corp. v. Vonage Holdings Corp.,
   503 F.3d 1295 (Fed. Cir. 2007) .................................................................................................. 13

Vitronics Corp. v. Conceptronic, Inc.,
   90 F.3d 1576 (Fed. Cir. 1996) ................................................................................................ 5, 11

## Other Authorities

*Manual of Patent Examining Procedure* § 2111.03 (8th ed. 2007) .................................................. 6

## I. INTRODUCTION

Computers and related systems store and transmit vast amounts of duplicative data. Significant chunks of duplicative data are scattered throughout all types of applications and data sets. Duplicative data imposes very significant costs of data storage and transmission on all types of computer systems. Elimination of duplicative data significantly reduces the space required to store computer data sets. It also materially increases the speed and efficiency of data transmission. The concept is simple: only non-duplicate portions need be transmitted, with the transmitted revisions simply incorporated into existing data sets, thereby eliminating the need to transmit an entire revised data set.

At the time Dr. Williams filed his application for patent on February 17, 1995, there was a need for computer systems to optimize data storage and transmission by eliminating duplicative data. Dr. Williams' invention changed that.

### A. The Fixed-Length Paradigm.

Prior to Dr. Williams' invention, the prevailing approach to the identification of duplicative data involved breaking data sets up into fixed-length pieces, or subblocks. Dividing the data set into subblocks allows the subblocks to be compared in order to identify duplicative (i.e., identical) subblocks. Unique subblocks can then be placed into a single block pool, and each subblock can be identified by a unique reference. Data sets then consist of non-duplicative data plus the references that point to subblocks in the subblock pool.

The figure below illustrates how duplicative data can be eliminated using references that point to unique subblocks:

[Figure: Diagram showing "A File's Block Index" (Blocks 1-5) and "Another File's Block Index" (Blocks 1-3) with arrows pointing to shared subblocks in a "Block Pool".]

In the data set associated with the Block Index on the left, the third subblock and the fifth subblock are identical. They are not repeated in the data set. Instead, a reference points to a single subblock of data in the Block Pool.

On the surface, the use of fixed-length subblocks might appear to eliminate some duplicative data. However, a closer analysis reveals that is not the case. Comparison of fixed-length subblocks can only identify duplicative data if that data is exactly aligned with the subblocks. The utility of using fixed-length subblocks is severely limited by the fact that "identical portions of data can occur in different sizes and places within a group of blocks of data." United States Patent No. 5,990,810, Col. 1, lines 51-53.[1] Methods using fixed-length subblocks cannot identify duplicative data within a portion of a subblock.

Figure 1 of Dr. Williams' '810 patent illustrates the inability of fixed-length analyses to see data duplication occurring within portions of subblocks:

| Demonstr |ates con| tent mis |alignmen| t. |

|XDemonst|rates co | ntent mi|salignme| nt.|

---

[1] This patent (the "'810 patent") is attached as Exhibit G to the Declaration of Nathaniel Bruno filed concurrently herewith. Citations to the '810 patent from here forward are simply to its columns, lines, and/or figures.

The only difference between each of the five subblocks on the top line and the five subblocks on the bottom consists of a single letter. Otherwise, all of the top and bottom pairs of subblocks are aligned so that every character except one is identical. In this example, a comparison of these fixed-length subblocks would not identify any data duplication at all. The presence of a single different character causes a fixed-length analysis to miss substantial pockets of duplicative data. In fact, all other factors being equal, the perfect alignment of duplicative data within fixed-length subblocks would be purely coincidental. For that reason, fixed-length analysis would fail to detect the vast majority of duplicative data in many systems.

**B.    Dr. Williams Invents a Method for Using Data in the Block Itself to Partition Blocks of Data Into Variable-Length Subblocks.**

The limitations of the fixed-length subblocks method were overcome by the method Dr. Williams invented in late 1994, and claimed in the '810 patent, which issued on November 23, 1999. Dr. Williams' method provided a practical means to identify duplicative data regardless of where it occurs in the data set. The '810 patent method is utilized in all of Riverbed's current line of products.

In January 1992, Dr. Williams posted an article to the Internet news group "comp.compression" containing an idea for finding similar fixed-length parts of documents. Declaration of Nathaniel Bruno in Support of Quantum Corporation's Claim Construction Brief ("Bruno Decl."), Ex. A at QU01212278-282. This posting laid the background for his later invention. It involved the use of a type of hash function known as a checksum. A hash function is a well-known type of algorithm that generates "an output block of bits that is based on the input block." Col. 10, lines 66-67. Checksums work by adding up the basic components of a data string and storing the resulting value. The checksum value from one data string can be compared to the checksum from another data string to assess whether they are possibly identical. If the values for two data strings are the same, the strings are likely duplicative.

Dr. Williams' posting did not use checksums to directly compare data strings to assess identicality. Instead, he proposed running checksums on a sliding window of an

unspecified number "N" of bytes at each position on the data strings. Bruno Decl., Ex. A at QU01212274-275. His 1992 posting further proposed that the checksum value be recorded only where it matched a predetermined value. The predetermined value could be any value determined in advance. *Id*.

The effect of this method is to select what Dr. Williams called "interesting" data portions — meaning those whose checksum values match the predetermined value. Dr. Williams concluded that so "long as the total number of interesting things recorded is eclipsed by the size of the reduced checksum space, this algorithm forms an efficient method for identifying documents sharing large slabs of text." *Id.* at QU01212276.

Based on the foregoing background, Dr. Williams' invention took place in late 1994. On November 21, 1994, Dr. Williams wrote to Mr. David Farajun of Data Storage Inc., setting forth his "solution to the problem of detecting data sets in such a way that the changes can be represented compactly." Bruno Decl., Ex. B. Dr. Williams explained that his technique "can cope efficiently with the insertion, deletion, re-arrangement, and modification of variable-length runs of bytes in a file." *Id*. at QU000625. He wrote that "[a]s far as I know, [] this technique is original." *Id*.

Dr. Williams' 1994 invention built upon the ideas disclosed in his 1992 posting by proposing that a sliding window run a checksum along the data and record those "interesting" sections where the checksum conforms to a predetermined value. In his 1994 invention, Dr. Williams took the further step of proposing the option to impose boundaries at those "interesting" sections where the checksum conforms to a predetermined value or set of rules. Dr. Williams' new method allowed subblocks to be partitioned in such a way that like portions of data would be compared each other. The variable-length subblocks defined by those boundaries could be compared, using various methods to identify duplicative data.

Dr. Williams explained his solution to Mr. Farajun as follows:

> The important thing is not to define the blocks on fixed boundaries (e.g. every 1024 bytes). By defining the boundaries at arbitrary points based on the data (e.g. where a checksum takes a particular value), common subsections of the old and new version of the file

can be detected, even though bytes have been inserted, deleted, or
the contents of the file have been rearranged.

Bruno Decl., Ex. B at QU000626.

With this elegant inventive concept, Dr. Williams achieved what had not been possible using the old fixed-length approach. Unlike his predecessors, Dr. Williams was able to devise a method for partitioning a block of data into a plurality of subblocks of variable length that could be used to locate most of the duplicative data within a data set. No longer was the hunt for duplicative data limited to those data strings that happened to be precisely identical to fixed-length segments.

## II. ARGUMENT

### A. The Legal Standards For Claim Construction.

Given the Court's familiarity with the legal principles governing the construction of patent claims, a lengthy exposition is unnecessary. Further, the powerful but elegantly simple concept of Dr. Williams' invention is well described in the specification and claims of the '810 patent, thereby eliminating any significant ambiguity.

Construction of the claim terms at issue is controlled by two fundamental principles. First, patentees are entitled to be their own lexicographers. *E.g.*, *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc). Second, when they are not defined in the specification, the "words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* at 1312-13 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1592 (Fed. Cir. 1996)). By and large, Riverbed's proposed constructions both contravene and muddy the plain language of the claims and the clear definitions in the specification.

### B. "Subblock."

| '810 Patent Term | Quantum's proposed construction | Riverbed's Proposed Construction |
|---|---|---|
| subblock | A part of a block. | A part of a block consisting of a series of bits or bytes of the digital data from the block. |

Quantum and Riverbed substantially agree on the construction of the claim term "subblock." First, they agree that a subblock is "a part of a block," and their constructions differ only in that Riverbed would add further explanatory language. Second, Quantum and Riverbed agree that the term "subblock" should be construed in light of the express definition in the specification. Neither relies on the file history or expert testimony. Finally, the parties agree on which portion of the '810 patent specification defines the term subblock, and both cite it in the Joint Claim Construction Statement:

> The term block and subblock both refer, without limitation, to finite blocks or infinite blocks (sometimes called streams) of zero or more bits or bytes of digital data. Although the two different terms ("blocks" and "subblock") essentially describe the same substance (digital data), the two difference terms have been employed in this specification to indicate the role that a particular piece of data is playing. The term "block" is usually used to refer to raw data to be manipulated by aspects of the invention. The term "subblock" is usually used to refer to a part of a block. "Blocks" are partitioned into "subblocks."

Column 2, lines 51-62. The key teaching of this portion of the specification is that the terms block and subblock "essentially describe the same substance. . . ." Column 2, line 55.

In the Joint Claim Construction Statement, Quantum and Riverbed have stipulated that the term "block" means "Finite or infinite streams of zero or more bits or bytes of digital data." Bruno Decl., Ex. C at Ex. B, Part I.

The additional language proposed by Riverbed is unnecessary and confusing. (*See* Riverbed's Proposed Construction of "subblock" ("consisting of a series of bits or bytes of the digital data from the block"). Given that both parties agree that a subblock is a portion of a block, it necessarily follows that subblocks are composed of bits or bytes of digital data. There is no need to restate that subblocks, like blocks, are composed of bits or bytes of digital data. Nor is there any need to state that bits and bytes in the subblock are "from" a block. These principles are inherent in the statement – which both parties agree is correct -- that a subblock is a portion of a block.

1   There is another, more significant problem with Riverbed's proposed definition —
2 it uses the words "consisting of."  The transitional phrase "consisting of" has a well established
3 meaning in patent law.  It is highly restrictive; it "excludes any element, step, or ingredient not
4 specified in the claim."  *Manual of Patent Examining Procedure* § 2111.03 (8th ed. 2007);
5 *Conoco, Inc. v. Energy & Envtl. Int'l*, 460 F.3d 1349, 1360 (Fed. Cir. 2006) ("The phrase
6 'consisting of' signifies restriction and exclusion of unrecited steps or components.")

7   This restrictive concept has no application to construction of the term "subblock,"
8 and contradicts the intrinsic evidence.  First, the parties have stipulated to a broad definition of the
9 term "block" that does not include the restrictive concept of "consisting of."  To inject that
10 restrictive concept into the definition of subblock would therefore contradict the express teaching
11 of the specification that the terms "block" and "subblock" "essentially describe the same
12 substance."  *See* Col. 2, lines 55-56.  By contrast, Quantum's proposed construction is consistent
13 with the specification, which states that a "subblock" is "a part of a block."  Col. 2, lines 59-60.

14   Second, and more important, there is no support whatsoever in the '810 patent
15 specification for the proposition that either blocks or subblocks consist of only bits or bytes and
16 nothing else.  To the contrary, the specification expressly describes both blocks and subblocks as
17 referring to "raw data to be manipulated by aspects of the invention."  Col. 2, lines 54-61.
18 Defining "subblocks" in the restrictive fashion asserted by Riverbed would be improper.  *Dow*
19 *Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1379-80 (Fed. Cir. 2001) (vacating
20 summary judgment of noninfringement in part because "the district court improperly imported a
21 limitation not supported by the claim language or the specification"); *Keithley v. The*
22 *Homestore.com, Inc.*, No. C03-04447, 2007 U.S. Dist. LEXIS 71126, at *21 (N.D. Cal. Sept. 12,
23 2007) ("Because neither the claim language, the specification, nor the prosecution history include
24 such a specific limitation, the Court shall not impose one.") (attached as Bruno Decl., Ex. D); *see*
25 *also Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005) (declining
26 patentee's "plea for the import of a limitation to help preserve the validity of the asserted claims"
27 because "[t]he limitation finds no support in the claims, written description, prosecution history, or
28 technical dictionary.").

1    Accordingly, the Court should not adopt Riverbed's proposed construction, and
2 should instead define "subblock" as "a part of a block."

3 **C.    "Predetermined Constraint."**

| '810 Patent Term | Quantum's proposed construction | Riverbed's Proposed Construction |
|---|---|---|
| predetermined constraint | criteria for identifying a subblock boundary | a function that accepts a window of bytes of length A+B and returns a boolean value to indicate whether a boundary should be placed between the A and B parts of the window.  Only the bytes in the window of bytes of length A + B can effect the decision of whether a boundary should be placed at position K | K+1. |

14    Claim 1 states that the predetermined constraint must be applied to a sliding
15 window described as "[k-A+1 . . . k+B]."  Claim 1 does not in any way attempt to restrict the
16 nature of the predetermined constraint.  The specification repeatedly emphasizes that *any* criteria
17 can be used.  The Summary of the Invention states:  "For example, a block could be partitioned at
18 each point at which the preceding three values has to [*sic*] a particular constant value."  Col. 1,
19 lines 62-64.  The value is not restricted — it need only be constant.
20    Accordingly, Figures 4, 5, 10, 11, 12, 13 and 24 all refer to the predetermined
21 constraint simply as "constraint F."  Figs. 4-5, 10-13, 24.  The specification expressly states that
22 the "requirements for the block partitioning constraint (e.g. in the form of a constraint function F)
23 are not stringent . . . ."  Col. 13, line 66-Col. 14, line 1.  While the specification states that "care
24 should be taken to select a function that suits the application to which it is to be applied," nothing
25 in the specification limits the invention to a particular constraint F.  Further, nothing in the
26 specification suggests that a boundary must be placed at every position that satisfies the
27 predetermined constraint.
28

1          The construction proposed by Quantum correctly captures the breadth of the term "predetermined constraint" as disclosed in the '810 patent specification.  The unwieldy and confusing construction proposed by Riverbed would introduce a host of inaccuracies, ambiguities and restrictive concepts inconsistent with the specification and unsupported by the extrinsic evidence upon which Riverbed relies.

           First, Riverbed seeks to include the concept of "accepts a window" into the definition of a predetermined constraint.  In the context in which it is used in Riverbed's proposed construction, the term "accepts a window" obviously has some technical meaning.  The problem is that this term is not used anywhere in the '810 patent specification or claims.  Thus, at this point, only Riverbed knows what this term means.  Riverbed's use of this term in its proposed claim construction thus does nothing to advance understanding of the patent, and would serve only to foster unnecessary and dangerous confusion.

           Second, Riverbed refers to a "window of bytes of length A + B."  Again, the patent does not contain this language.  It is unclear why Riverbed's construction limits a window to "bytes," given Riverbed has stipulated that blocks (and by necessary implication subblocks) are streams of "bits or bytes."  *See* Bruno Decl., Ex. C at Ex. B, Part I.  Further, Riverbed's definition of a window as having a length A + B sheds absolutely no meaning on the claim term — it simply rewrites the claim language, presenting new challenges for interpretation and causing unnecessary confusion.  Moreover, it has no support in the specification or the claims.  *Dow Chem.*, 257 F.3d at 1379-80; *Keithley*, No. C03-04447, 2007 U.S. Dist. LEXIS 71126, at *21; *see also Seachange Int'l*, 413 F.3d at 1377.

           Third, Riverbed's proposed requirement that "Only the bytes in the window of bytes of length A + B can effect the decision of whether a boundary should be placed at position k|k+1" is unsupported and manifestly wrong.  Claim 1 requires only that "at least one" boundary be placed at a position at which the predetermined constraint is satisfied.  *See* Col. 24, lines 57-65.  The language of the claim does not require that a boundary be placed at every position at which the predetermined constraint is satisfied.  Given that a boundary need not be placed at every position where the constraint is satisfied, it necessarily follows that criteria other than the "bytes of

1 length A+B" can be employed in the decision whether to place a boundary. Further, the invention
2 provides for boundaries to be placed at positions other than those at which the predetermined
3 constraint is satisfied. For example, the specification contains a whole section discussing the
4 desirability of placing "artificial bounds" on subblock size by placing boundaries at positions not
5 identified by the predetermined constraint. Col. 14, line 54-Col. 16, line 52. In addition, Claim 4
6 encompasses "The method of claim 1, wherein at least one bound is imposed on the size of at least
7 one of said plurality of subblocks." Col. 24, lines 9-11. This dependent claim expressly covers an
8 instance where a boundary is placed without regard to the predetermined constraint.

9 Riverbed's proposed construction not only contradicts the express language of the
10 patent specification, it would improperly add a significant restriction to the scope of claim 1 that
11 lacks support in the patent or the file history. *See* Col. 24, lines 57-65. Riverbed bases its position
12 on language lifted from a set of two sentences in a memorandum written by Dr. Williams in July
13 2005, entitled "Structure and Practise of the Blocklets Patent":

> To evaluate whether a partition should be made at the boundary between the bytes at position k and k+1, we evaluate whether the bytes within a window consisting of A bytes to the left of the position and B bytes to the right. Only the bytes in this window can affect the decision of whether to put a boundary at the position k|k+1.

Bruno Decl., Ex. E at QU00200847.

19 Riverbed's attempt to incorporate its version of these two sentences into the
20 definition of "predetermined constraint" perfectly illustrates the danger of improperly relying on
21 such extrinsic evidence. Dr. Williams is not an expert in claim construction. He wrote the memo
22 on which Riverbed relies in July 2005, over 10 years after he filed an initial application for patent.
23 Bruno Decl, Ex. F at 157:1-5. Although the memorandum was couched in terms of an explanation
24 of the claims, Dr. Williams testified that he was attempting to assist in the marketing of his patent
25 and technology by providing a general understanding of his invention from a business and
26 technology standpoint. *Id*. at 156:7-157:5, 162:24-163:6. Significantly, the passage Riverbed
27 cites refers only to bytes, and makes no mention of bits, which both Riverbed and Quantum agree
28

1  are covered by the '810 patent claims.  This omission is a strong indication that the purpose for
2  which the document was written did not require Dr. Williams to pay careful attention to the
3  precise scope of the claims.  Accordingly, this memorandum is not suitable for use as extrinsic
4  evidence.  *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1342 n.2 (Fed. Cir. 2003)
5  ("Sunglass Hut argues that [the inventor] admitted during his deposition that the terms 'vivid' and
6  'strong' are synonymous.  We consider that testimony to be of little value in the definiteness
7  analysis or claim construction."); *Vitronics,* 90 F.3 at 1584-85 ("Nor may the inventor's subjective
8  intent as to claim scope, when unexpressed in the patent documents, have any effect.  Such
9  testimony cannot guide the court to a proper interpretation when the patent documents themselves
10 do so clearly."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995) (en
11 banc) ("The subjective intent of the inventor is of little or no probative weight in determining the
12 scope of a claim (except as documented in the prosecution history)."); *N. Am. Vaccine, Inc. v.
13 Nat'l Research Council*, 7 F.3d 1571, 1578 (Fed. Cir. 1993).

14         Further, it is clear from the memo itself that Dr. Williams was referring to
15 comparing the contents of the window for determining whether a predetermined constraint has
16 been met; he never discussed the use of that information for actually applying the predetermined
17 constraint for whether an actual boundary should be drawn.  Dr. Williams' analysis in this
18 memorandum is limited to the portion of claim 1 where the contents of a fixed length window are
19 compared for a match.  Dr. Williams' discussion of only a portion of claim 1 demonstrates the
20 clear danger associated with using a marketing memorandum written almost a decade later to
21 contradict the express language of the specification and the patent.  *See Phillips*, 415 F.3d at 1319,
22 1324 (holding extrinsic evidence "may not be used to contradict claim meaning that is
23 unambiguous in light of the intrinsic evidence").  It does not support  Riverbed's proposed claim
24 construction.

1  D.  <u>**"Hierarchy" (Quantum); "An Additional Hierarchy of Subblocks is Formed from at**</u>
2     <u>**Least One Group of Contiguous Subblocks" (Riverbed)**</u>

| '810 Patent Term | Quantum's proposed construction | Riverbed's Proposed Construction |
|---|---|---|
| Hierarchy | A system or series of terms of successive rank. | |
| An additional hierarchy of subblocks is formed from at least one group of contiguous subblocks | | Multiple layers of subblocks are constructed from one or more initially contiguous subblocks by progressively restricting a constraint function to generate the multiple layers of subblocks, where the boundaries of the higher layer subblocks are aligned with the subblock boundaries of all the subblock layers below it. |

Quantum asks the Court to construe the term "hierarchy" in accordance with the ordinary meaning of the term. This ordinary meaning is consistent with the use of the term in the '810 patent specification and claims. Combined with the definition of the term "subblocks," Quantum's proposed construction of "hierarchy" would render the phrase Riverbed would have this Court construe (which is the limitation in dependent claim 6 that distinguishes that claim from claim 1) perfectly intelligible.

In contrast, Riverbed's proposed construction would do nothing to clarify the meaning of the claims. In effect, Riverbed proposes to rewrite the claims into more complex language. The language of the claim itself, as clarified by construction of the term subblock, is far clearer than Riverbed's proposed construction. Riverbed's proposed construction should be rejected because it does not clarify any ambiguity, but would serve only to introduce unnecessary complexity and danger of confusion and error. *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily

1 apparent …, and claim construction … involves little more than the application of the widely
2 accepted meaning of commonly understood words."); *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed.
3 Cir. 2001) ("We agree with this construction of the claim, for it is the plain reading of the claim
4 text.  These are not technical terms of art, and do not require elaborate interpretation."); *see also*
5 *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304-05 (Fed. Cir. 2007) (holding
6 district court did not err in refusing to construe the term "destination," and citing ordinary meaning
7 of the term).

8       The unnecessarily complex explanation of clear claim language which Riverbed
9 proposes is not supported by the '810 patent specification.  Riverbed cites several statements in the
10 specification describing how subblocks "can be" organized into a hierarchy.  *See* Col. 7, line 54;
11 Col. 15, line 38.  These statements cannot reasonably be read as a general definition of a
12 hierarchy.  They are merely descriptions of particular embodiments of a subblock hierarchy.  The
13 use of this language as a general definition is not only improper, but it raises more ambiguity than
14 it resolves by introducing new unexplained terms.

15       Riverbed's proposed definition incorporates the phrase "progressively restricting a
16 constraint."  The use of this term does not clarify anything; it merely inserts a new concept into the
17 claims that will itself require further explanation in order to be intelligible to a jury.

18       Riverbed also seeks to replace the claim's reference to "contiguous subblocks" with
19 the phrase "initially contiguous" subblocks.  Again, Riverbed seeks merely to change the claim
20 language rather than to resolve any ambiguity.  There is no reference in the '810 patent
21 specification to "initially" contiguous subblocks.  This additional restriction on the claim language
22 was constructed whole cloth by Riverbed for no apparent reason.

23
24     / / / / /
25
26     / / / / /
27
28     / / / / /

Riverbed's proposed construction further introduces the immaterial and potentially confusing concept that the "higher layer subblocks are aligned with the subblock boundaries of all the subblock layers below it."  Riverbed cannot and does not cite any portion of the '810 patent specification that refers to such a concept.  The words "aligned" and "higher layer subblocks" do not appear in the portions of the specification cited by Riverbed.  Again, Riverbed's proposed construction does nothing to resolve any ambiguity, but only serves to introduce unnecessary complexity and danger of error.

Dated:  May 29, 2008

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By    /s/ Nathaniel Bruno
AMAR L. THAKUR
MAURICIO A. FLORES
NATHANIEL BRUNO

Attorneys for
QUANTUM CORPORATION