AMAR L. THAKUR, Cal. Bar No. 194025
MAURICIO A. FLORES, Cal. Bar No. 93304
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:    858-720-8900
Facsimile:    858-509-3691
Email:    athakur@sheppardmullin.com
          mflores@sheppardmullin.com

NATHANIEL BRUNO, Cal. Bar No. 228118
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone:    415-434-9100
Facsimile:    415-434-3947
Email:    nbruno@sheppardmullin.com

Attorneys for
QUANTUM CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| RIVERBED TECHNOLOGY, INC., a Delaware corporation,<br><br>Counterclaimant,<br><br>v.<br><br>QUANTUM CORPORATION,<br><br>Counterdefendant. | Case No. C 07-04161 WHA<br><br>The Hon. William H. Alsup<br><br>**QUANTUM'S OPPOSITION TO RIVERBED'S OPENING CLAIM CONSTRUCTION BRIEF ON TERMS FROM U.S. PATENT NO. 7,116,249**<br><br>Claim Construction Hearing: July 9, 2008<br><br>Complaint Filed: August 14, 2007<br>Trial Date: March 30, 2009 |
| QUANTUM CORPORATION, a Delaware corporation,<br><br>Counterclaimant,<br><br>v.<br><br>RIVERBED TECHNOLOGY, INC., a Delaware corporation,<br><br>Counterdefendant. | |

1

## TABLE OF CONTENTS

2
Page

3

4

I.      INTRODUCTION..................................................................................................... 1

II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................. 1

5

III.    ARGUMENT ........................................................................................................... 2

6

7           A.      "Reference Label" ........................................................................................ 2

8           B.      "Back-End Storage System"......................................................................... 7

9

IV.    CONCLUSION ...................................................................................................... 11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:6GMB1\400884894.3
Case No. C 07-04161 WHA

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1

## TABLE OF AUTHORITIES

2

Federal Cases

3

Curtiss-Wright Flow Control Corp. v. Velan, Inc.,
    438 F.3d 1374 (Fed. Cir. 2006) ........................................................................... 7, 10

4

5

Honeywell Int'l, Inc. v. ITT Indus., Inc.,
    452 F.3d 1312 (Fed. Cir. 2006) ................................................................................. 7

6

7

Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,
    450 F.3d 1350 (Fed. Cir. 2006) ........................................................................... 7, 10

8

Network Commerce, Inc. v. Microsoft Corp.,
    422 F.3d 1353 (Fed. Cir. 2005) ............................................................................... 10

9

10

Nystrom v. Trex Co., Inc.,
    424 F.3d 1136 (Fed. Cir. 2005) ................................................................................. 9

11

O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,
    521 F.3d 1351 (Fed. Cir. 2008) ............................................................................. 1, 8

12

13

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................................... 1, 2, 7

14

Vitronics Corp. v. Conceptronic, Inc.,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................................... 2

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

## I.      INTRODUCTION

Quantum Corporation ("Quantum") submits this brief in opposition to Riverbed's proposed constructions for the '249 patent and in support of Quantum's proposed constructions. Two terms are at issue: "reference label" (used in asserted claims 1,2,7,8 and 13) and "back-end storage system" (used in asserted claims 19, 20, 21, 22, 25, 26, 27 and 28). One or the other of these two disputed terms are used in all thirteen of Riverbed's asserted claims.

## II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION

It is "well-settled" that "inventors are typically persons skilled in the field of the inventions and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (en banc).

A "determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning,' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Further, "[i]n many cases that give rise to litigation, [] determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to "the words of the claims, the specification, the prosecution history, and extrinsic evidence." *Phillips*, 415 F.3d at 1315.

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification is "'[u]sually ... dispositive'" in the claim construction analysis; "'it is the single best guide to the

-1-

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1  meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

2  1576, 1582 (Fed. Cir. 1996)).

3  **III.    ARGUMENT**

4

5      **A.    "Reference Label"**

6

7

| '249 Patent Term | Quantum's Proposed Construction | Riverbed's Proposed Construction |
|---|---|---|
| Reference Label | Globally unique data used to identify a segment. | Data used to identify a segment. |

11

12          Quantum and Riverbed agree that reference labels are used to identify segments.

13  However, Riverbed denies that reference labels are "globally unique."  This controversy has a

14  direct bearing on the adjudication of infringement.  Quantum's accused products do not use

15  globally unique reference labels.  Instead, Quantum identifies data segments using hashes

16  calculated with hash functions that allow for the possibility that different segments of data will

17  have the same identifying hash.[1]

18

19          Riverbed contends that the '249 patent specification (and the '666 patent

20  specification incorporated by reference) "specifically recognize that reference labels do not have

21  to be 'globally unique' and that two different segments could be assigned the same reference label

22  in some cases."  Riverbed Opening Brief re '249 Claim Terms [Docket No. 116], p. 9, lines 21-23.

23  Riverbed is wrong.  These specifications (collectively referred to as the "'249 patent

24  specification") state that the claimed invention requires the use of a globally unique label that

25  _____

26  [1]  Quantum changed its construction of "reference label" and "back-end storage system" after
         further consideration of Riverbed's positions in meet and confer sessions prior to filing the
27       parties' Joint Claim Construction and Prehearing Statement.  There has been no prejudice
         to Riverbed.

28

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1    precludes the possibility of error resulting from having the same label refer to two different data

2    segments.

3

4        The critical importance of a globally unique reference label is driven home by

5    Riverbed's own illustration of the invention claimed in claim 1.  Riverbed Opening Brief re '249

6    claim terms [Docket No. 116], p. 3, lines 3-9.  Riverbed hypothesizes a file containing the

7    following text:  "We went to the baseball game last night.  At the baseball game, I caught a fly

8    ball.  I drove home after the baseball game."  Riverbed then points out that this text can be

9    shortened by substituting a label such as "QWX" for the words "the baseball game," which is

10   repeated in each of the three sentences.  The file can then be accurately represented in a shortened

11   form, which costs less to store and transmit, using this label.  In effect, QWX is a code for "the

12   baseball game."

13       The "code" metaphor is repeatedly used in the '249 patent specification to describe

14   the claimed inventions.  The process of assigning labels to data segments is part of "the encoding

15   process."  '249 patent, Col. 9, line 29.[2]  The portion of the invention that performs this process is

16   referred to as "the encoder."  As explained in the Summary of Invention," the "encoder determines

17   whether the segment is to be a referenced segment or an unreferenced segment, replacing the

18   segment data of each referenced segment with a reference label and storing a reference binding

19   [i.e. an association between a reference and a segment] in a persistent segment store for each

20   referenced segment, if needed."  Col. 5, lines 19 – 24.  Figure 1 depicts an "encoder" that "encodes

21   a data stream or data block using segmentation based on content and segment references."  Col. 5,

22   lines 38-40.  A "decoder" is depicted in Figure 2.  Col. 5, lines 41-43; *see also* Col. 6, lines 15-46.

23       The encoding process is the essence of the invention claimed in claim 1.  *See*

24   *generally* Col. 9, lines 12-58.  Obviously, the claimed invention will not work properly if the code

25

26   [2] The '249 patent is attached as Exhibit A to the Declaration of Todd M. Briggs filed as Docket
27       No. 117 in connection with Riverbed's Opening Claim Construction Brief .  Citations to
         the '249 patent from here forward are simply to its columns, lines, and/or figures.

28

-3-

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1  fails.  Using Riverbed's own illustration, consider what would happen if QWX were the reference
2  label for both "the baseball game" and "he struck out."  The message would be gibberish if the
3  wrong segment were attached to the label QWX.  Instead of more efficient storage and
4  transmission, the result would be chaos and dysfunction.  A globally unique one-to-one
5  correspondence between the code symbol (the reference label) and a particular data segment is
6  important to any coding system.  The '249 patent specification expressly describes the unique one-
7  to-one correspondence between reference labels and segments as an essential element of the
8  coding invention described and claimed therein.

9
10            As described in the '249 patent specification, the first step in the encoding process
    occurs after "a new segment is defined (by finding a new segment boundary . . . ."  Col. 9, lines
11  12-13.  This first step –which does not involve reference labels – is to determine whether the
12  segment should be added to the Persistent Segment Store ("PSS").  Col. 9, lines 12-14.  If the
13  segment is identical to a segment that has already been stored in the PSS, it should not be added.
14  If it is not identical to a segment that has already been stored in the PSS (i.e., is a different
15  segment), then it should be added to the PSS.  Col. 9., lines 29-34.
16

17            The '249 patent specification notes that one way to determine whether a segment is
18  identical to any of the segments in the PSS would be to compare the hash value for the segment to
19  the hash values for the segments in the PSS.  However, the use of hash values leaves open the
20  possibility that "multiple segments hash to the same hash index."  Col. 9, lines 27-28.  To avoid
21  this problem, the specification states that where hash values are used "if the lookup succeeds[3], the
22  segment can compare each segment returned by the lookup to the segment in question to check for
23  an exact match."  Col. 9, lines 24-27.  In other words, comparison by hash values alone is not
24  sufficient to admit a newly-defined segment to the PSS.  The need to avoid duplicative segments
25  in the PSS requires that even after an initial comparison using hash values indicates that the
26

27  [3] I.e., indicates that the segment is identical to one already stored in the PSS.
28

W02-WEST:6GMB1\400884894.3
Case No. C 07-04161 WHA                QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1   newly-defined segment may be admitted, the data itself must be compared as a check.  Newly-

2   defined segments found to be identical to a segment in the PSS are always excluded from the

3   PSS.[4]

4

5       With this context, we come to the second step in the encoding process, which

6   consists of binding reference labels to segments being added to the PSS.  This is the critical

7   portion of the specification with respect to that term.  It begins with the words "Continuing the

8   description of the encoding process. . . ."  Col. 9, line 29.  These words indicate that what follows

9   is not the description of a particular embodiment, but rather is a description of the encoding

10  process that is critical to all embodiments of the invention.  The rest of the sentence states that in

11  the second step "a new unique name is assigned to the new segment and the binding (reference

12  label, segment data) is entered into the PSS."  Col. 9, lines 29-34.

13      Taken by itself and in context, this language could not be more clear:  reference

14  labels are "unique."  The choice of words in stating that a new unique name is "assigned" rather

15  than calculated is also significant, for calculation leaves open the possibility that a duplicative

16  label would be calculated for the same segment while assignment connotes the deliberate selection

17  of a unique name.  In contrast to the provision for "special case" exceptions in the first step of the

18  encoding process where segments are being compared, there is no exception to the requirement of

19  a "unique" one-to-one relationship between reference labels and segments stored in the PSS.  The

20  need for that unique identity is stressed again in the discussion of the encoder depicted in Figure 4,

21  where the specification states, "[S]ince reference labels are unique for unique data, the correct

22  segment data can *always* be provided."  Col. 10, lines 9-11 (emphasis added).

23      Riverbed may argue a unique one-to-one correspondence between reference labels

24  and segments is not necessary – but the specification unambiguously states otherwise.  There is a

25

26  _____

    [4] In "special cases," complete identity between segments is not required.  When less than complete
27      identity is allowed, the effect is to bar from the PSS similar but not identical segments.
        Col. 9, lines 29-34.  Under no circumstances are identical segments admitted into the PSS.

28

1  symmetry between the express provision that potentially imprecise hash values cannot be relied

2  upon for admission of a newly-defined segment to the PSS (step 1 of the encoding process) and

3  the express requirement that newly-admitted segments be "assigned" a "new unique name" (step

4  2).  Col. 9, lines 29-34.  It would make little sense to allow the use of imprecise hash values as

5  reference labels when the a similar imprecision is rejected as the gateway for entry of newly-

6  defined segments into the PSS.  Failure to require reference labels to have a unique one-to-one

7  correspondence to every segment in the PSS would not only conflict with the express language of

8  the specification, but would also break the careful symmetry which the inventors designed

9  between the level of precision demanded in both steps of the encoding process.

10
11         Riverbed quibbles over the word "globally," arguing that it appears only once in the

   '249 patent specification.  Riverbed Opening Brief re '249 claim terms [Docket No. 116], p. 3,
12
   lines 3-9.  This argument overlooks the fact that throughout the whole of the specification
13
   uniqueness is presented as an essential characteristic of all reference labels.  The sentence
14
   describing reference labels as "globally unique" is consistent with that disclosure and serves to
15
   indicate that the quality of uniqueness is not confined to any particular set of segment/reference
16
   label bindings, but exists throughout all of them.  Col. 15, lines 19-21.
17

18         Riverbed cannot and does not point to a single embodiment in which reference

19  labels are not unique.  Riverbed points to language in the '666 patent specification referring to

20  alternative "schemes" that use non-unique reference labels and characterizing them as "less than

21  desirable."  '666 Patent, Col. 14, line 43 [Exhibit B to Declaration of Todd M. Briggs filed as

22  Docket No. 117]; Riverbed Opening Brief re '249 claim terms [Docket No. 116], p. 9, lines 4-19.

23  Riverbed's contention that this language suggests that the use of non-unique reference labels is

24  within the scope of the invention is simply preposterous.  To the contrary, particularly in light of

25  the teaching of the above-cited disclosures of the '249 patent specification, this language suggests

26  that the use of non-unique reference labels is contrary to the claimed invention.

27
28

W02-WEST:6GMB1\400884894.3
Case No. C 07-04161 WHA

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

The '249 patent claims, including the term "reference label," must be read in the context of the specification, which is the single best guide to the meaning of disputed claim terms. *Phillips*, 415 F.3d at 1313, 1315; *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316, 1318 (Fed. Cir. 2006) (where written description describes the invention as a whole, it limits the invention because "[t]he public is entitled to take the patentee at his word").

Taken as a whole, the '249 patent specification makes clear that unique reference labels are an essential component to the invention. Accordingly, that description limits the scope of the claimed invention. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1378-80 (Fed. Cir. 2006) (limiting the term "adjustable" where the specification consistently and without exception described adjustment that occurred during operation rather than via dismantling); *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1353-57 (Fed. Cir. 2006) (construing "host interface" as limited to "a direct parallel bus interface" where the specification only disclosed that type of bus interface and emphasized its importance in solving the problems in the prior art, and the prosecution history supported the interpretation). The Court should reject Riverbed's attempt to divorce the term "reference label" from the context of the specification.

**B.    "Back-End Storage System"**

| '249 Patent Term | Quantum's Proposed Construction | Riverbed's Proposed Construction |
|---|---|---|
| Back-End Storage System | A non-local, HCS-enabled storage system that accepts commands from a front-end file server to store and retrieve whole files. | Plain and ordinary meaning. |

Back-end storage is not a term that most jurors use every day and may be presumed to understand. It is a technical term. Jurors cannot be expected to know and apply this technical

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1    term without judicial instruction.  Moreover, the proper meaning of this technical term is a matter

2    of law for the Court to decide.  It would be error to fail to provide the jury with this necessary

3    instruction.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, supra, 521 F.3d 1351, 1361.

4
5           The cases upon which Riverbed relies for the proposition that no instruction is

6    required are plainly inapposite.  They apply to words that most people use every day such as

7    "movie," "item" and "tubular."  The term "back-end storage system" does not fall into this

8    category.

9           It is telling that Riverbed has failed to introduce any extrinsic evidence that "back-

10   end storage system" has a plain and ordinary meaning even to persons skilled in the relevant art.

11   If there is no common understanding among experts, how can lay jurors be expected to understand

12   this term?

13
14          Quantum's accused products do not have a non-local, HCS-enabled storage system

15   that accepts commands from a front-end file server to store and retrieve whole files.  Riverbed

16   provides no explanation why the term "back-end storage system" encompasses accused products

17   that lack these features.  Instead, Riverbed merely repeats that back-end storage means, well, a

18   back-end storage system.  That is not at all helpful.  It is, rather, an obfuscation.  This obfuscation

19   reflects Riverbed's inability to derive a coherent meaning that preserves its infringement position.

20          Absent expert testimony as to the understanding of persons of ordinary skill in the

21   art, the Court's only recourse for ascertaining the meaning of this term lies in the specification of

22   the '249 patent and other intrinsic evidence.  Unfortunately, the term "back-end storage system"

23   does not appear in the '249 patent specification.  Even the term "back-end" is missing.  Nor is there

24   any discussion of the meaning of "back-end storage system" in the file history.  The only

25   references to "back-end storage system" are in the claims, which are of no help in determining the

26   meaning of this term.

27
28

-8-

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

No wonder Riverbed is at a loss to proffer a construction – the '249 patent inventors claimed a "back-end storage system" that lacks an established meaning in the relevant art and neglected to provide any discussion in the specification that supports a construction broader than the embodiments described therein.  In such circumstances, a construction confined to the embodiments is warranted.  Indeed, even if "back-end storage system" had an ordinary meaning (which is does not), it should be construed with reference to its consistent usage in the preferred embodiments, regardless of whether that term might be read more broadly based on its plain language.  *See Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (limiting "board" to wood cut from a log, despite absence of clear disavowal of claim scope, because the specification and prosecution history consistently referred to wood boards).

There is only one embodiment of claim 19.  That embodiment is first mentioned at column 16, line 37, which states that, "[I]n another embodiment, HCS can be used as a complementary component of a more standard, operating system-based file system by combining the NLFS described above with a file system front end."  Col. 16, lines 37-40.  The reference to other embodiments refers to embodiments that do not have a front-end and back-end.  These other embodiments are not material to the construction of the term "back-end storage system."

This solitary embodiment of claim 19 uses HCS.  Riverbed's citation to portions of the specification that refer to "only one level of references rather than the hierarchy of references used in HCS" is inapposite because it refers to embodiments of other claimed inventions, not to embodiments of claim 19.  Riverbed Opening Brief re '249 Patent Claim Construction [Docket No. 116], p. 13, lines 7-8.  Significantly, the specification states with great specificity that "HCS can be used" with the invention of claim 19, not that the front-end/backend formation of claim 19 is generally applicable to non-HCS embodiments.  Col. 16, line 37.

The lone embodiment of claim 19 also employs a storage element that accepts commands from a front-end server and retrieves whole files.  Col. 16, lines 37-49.  This storage element is the component referred to in claim 19 as the back end storage system.  It is separate and

-9-

1   distinct from the front-end storage system.  The front-end is local in relation to the user.  Col. 16,

2   lines 44-47.  The back-end, which can only be defined in contradistinction to the front-end, is not.

3   *See* Riverbed Opening Brief re '249 Patent Claim Construction [Docket No. 116], p. 11, lines 12-

4   14.  This distinction is captured in Quantum's construction with the term "non-local."  It is

5   supported in by the use of the term "local" to describe the front-end system from which the back-

6   end system must be distinguished.

7

8       In *Network Commerce, Inc. v. Microsoft Corp.*, the disputed term "download

9   component" was not clarified by the claim language, was not present in the specification, and a

10  definition of the term as a whole did not exist in the computer art.  *Network Commerce, Inc. v.

11  Microsoft Corp.*, 422 F.3d 1353, 1359-60 (Fed. Cir. 2005).  The Federal Circuit rejected the

12  patentee's requests to (1) combine individual dictionary definitions of the two words, as it was not

13  tenable in light of the specification, and (2) to construe the term as broadly as the term

14  "component," simply because "component" was used broadly in the specification.  *Id*.  Instead, the

15  court found that based on what the specification both contained and omitted, a download

16  component must contain a specific type of program that interacted in a certain way with the

17  computer's operating system.  *Id*. at 1360-61.

18      Here, the only embodiment of claim 19 is a non-local, HCS-enabled storage system

19  that accepts commands from a front-end file server to store and retrieve whole files.  Fig. 13; Col.

20  15, lines 44-59; Fig. 14; Col 16, lines 37-52.  This is not merely a preferred embodiment, as

21  Riverbed contends.  Rather, it is the only basis available for determining the meaning of and

22  defining the technical term "back-end storage system," because that term is not clarified by the

23  claim language and the jury may not construe the term.  This definition (i.e., Quantum's proposed

24  construction) should therefore be adopted by the Court.  *See Curtiss-Wright Flow Control Corp. v.

25  Velan, Inc.*, supra, 438 F.3d 1374, 1378-80; *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,

26  supra, 450 F.3d 1350, 1353-57.

27

28

QUANTUM'S OPPOSITION TO RIVERBED'S
OPENING CLAIM CONSTRUCTION BRIEF ON
TERMS FROM U.S. PATENT NO. 7,116,249

1    **IV.     CONCLUSION**

2           For the foregoing reasons, the Court should adopt the constructions proposed by

3    Quantum and reject those proffered by Riverbed.

4

5    Dated:  June 12, 2008

6                                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

7

8                                      By      */s/ Nathaniel Bruno*
                                               AMAR L. THAKUR
9                                              MAURICIO A. FLORES
                                               NATHANIEL BRUNO
10
11                                      Attorneys for QUANTUM CORPORATION
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-11-