1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   Claude M. Stern (Bar No. 96737)
2    claudestern@quinnemanuel.com
   Todd M. Briggs (Bar No. 209282)
3    toddbriggs@quinnemanuel.com
   555 Twin Dolphin Drive, Suite 560
4  Redwood Shores, California 94065-2139
   Telephone:    (650) 801-5000
5  Facsimile:    (650) 801-5100

6  Attorneys for Counterclaimant and
   Counterdefendant, RIVERBED TECHNOLOGY,
7  INC.

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12 RIVERBED TECHNOLOGY, INC., a          CASE NO. C 07-04161 WHA
   Delaware corporation
13                                        Honorable William H. Alsup
                Counterclaimant,
14                                        **RIVERBED'S OPPOSITION CLAIM
        vs.                               CONSTRUCTION BRIEF ON TERMS
15                                        FROM U.S. PATENT NO. 5,990,810**
   QUANTUM CORPORATION, a Delaware
16 corporation,                          Date:    July 9, 2008
                                         Time:    1:30 p.m.
17              Counterdefendant.        Crtrm.:  Courtroom 9

18 QUANTUM CORPORATION, a Delaware
   corporation,
19
                Counterclaimant,
20      vs.

21 RIVERBED TECHNOLOGY, INC., a
   Delaware corporation,
22
                Counterdefendant.
23

24

25      ** REDACTED VERSION FOR PUBLIC FILING **

26

27

28
                                              Case No. C 07-04161 WHA
                          RIVERBED'S OPPOSITION CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ON THE '810 PATENT ........................................................ 2

    A.    A Principle Of Locality Governs The Partitioning Method Claimed In The
       '810 Patent ............................................................................................... 2

    B.    Dr. Williams Was Not The First To Invent A Method For Using Data In
       The Block Itself To Partition Blocks of Data Into Variable-Length
       Subblocks ................................................................................................. 5

III.    LEGAL STANDARDS ....................................................................................... 6

IV.     CONSTRUCTION OF "PREDETERMINED CONSTRAINT" ........................ 7

    A.    Riverbed's Proposed Construction .......................................................... 8

       1.    A "Predetermined Constraint" Is "A Function That Accepts A
          Window Of Bytes Of Length A+B And Returns A Boolean Value
          To Indicate Whether A Boundary Should Be Placed Between The A
          And B Parts Of The Window." ................................................... 8

       2.    Only The Bytes In The Window Of Bytes Of Length A+B Can
          Affect The Decision Of Whether A Boundary Should Be Placed At
          Position k|k+1. ......................................................................... 10

       3.    Quantum's Arguments Against Riverbed's Construction Are Not
          Persuasive. ............................................................................... 13

    B.    Quantum's Proposed Construction ........................................................ 15

V.      CONSTRUCTION OF "SUBBLOCK" .............................................................. 16

VI.     CONSTRUCTION OF "AN ADDITIONAL HIERARCHY OF SUBBLOCKS IS
    FORMED FROM AT LEAST ONE GROUP OF CONTIGUOUS SUBBLOCKS" ......... 18

    A.    Riverbed's Proposed Construction ........................................................ 19

    B.    Quantum's Proposed Construction ........................................................ 20

VII.    CONCLUSION .................................................................................................. 22

1

## TABLE OF AUTHORITIES

2

<u>Page</u>

3

<u>Cases</u>

4    *ASM America, Inc. v. Genus, Inc.*,
     No. C-01-2190-EDL, 2002 WL. 1892200 (N.D. Cal. Aug. 15, 2002) ....................................... 8

5

   *C.R. Bard, Inc. v. U.S. Surgical Corp.*,
6      388 F.3d 858 (Fed. Cir. 2004).................................................................................................... 12

7    *Cat Tech LLC v. TubeMaster, Inc.*,
     No. 2007-1443, 2008 WL. 2188049 (Fed. Cir. May 28, 2008) .................................................. 7

8

   *Comark Communications, Inc. v. Harris Corp.*,
9      156 F.3d 1182 (Fed. Cir. 1998)................................................................................................... 7

10    *Comcast Cable Communications Corp., LLC v. Finisar Corp.*,
     No. C 06-04206 WHA, 2007 WL 1052821 (N.D. Cal. Apr. 6, 2007)................................... 20, 21

11

   *DeMarini Sports, Inc. v. Worth, Inc.*,
12      239 F.3d 1314 (Fed. Cir. 2001)................................................................................................. 23

13    *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
     64 F.3d 1553 (Fed. Cir. 1995)................................................................................................... 17

14

   *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Systems, LLC*,
15      350 F.3d 1327 (Fed. Cir. 2003)................................................................................................. 22

16    *Halliburton Energy Services, Inc. v. M-I LLC*,
     514 F.3d 1244 (Fed. Cir. 2008)................................................................................................. 16

17

   *Honeywell Inc. v. Victor Co. of Japan, Ltd.*,
18      298 F.3d 1317 (Fed. Cir. 2002)............................................................................................ 21, 22

19    *Interactive Gift Express, Inc. v. Compuserve Inc.*,
     256 F.3d 1323 (Fed. Cir. 2001)............................................................................................. 7, 10

20

   *L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*,
21      499 F.3d 1303 (Fed. Cir. 2007)................................................................................................... 8

22    *Markman v. Westview Instruments, Inc.*,
     52 F.3d 967 (Fed. Cir. 1995)............................................................................................ 5, 7, 8, 15

23

   *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*,
24      521 F.3d 1351 (Fed. Cir. 2008)................................................................................................... 5

25    *Phillips v. AWH Corp.*,
     415 F.3d 1303 (Fed. Cir. 2005)................................................................................. 7, 15, 16, 22, 23

26

   *S3 Inc. v. NVIDIA Corp.*,
27      259 F.3d 1364 (Fed. Cir. 2001)................................................................................................. 16

28

*In re Sabatino,*
   480 F.2d 911 (C.C.P.A. 1973) ...................................................................................................17

*Voice Technologies Group, Inc. v. VMC Systems, Inc.,*
   164 F.3d 605 (Fed. Cir. 1999).........................................................................................12, 15

**Statutes**

35 U.S.C. § 112, ¶ 6 ...............................................................................................................16

1    I.    **INTRODUCTION**

2    The parties have identified the following three limitations from the '810 patent for

3    construction: (1) "predetermined constraint," (2) "subblock," and (3) "an additional hierarchy of

4    subblocks is formed from at least one group of contiguous subblocks."

5    Riverbed's construction for "predetermined constraint" clarifies the meaning of this

6    uncommon term and is fully supported by the intrinsic record. Riverbed's construction tracks the

7    definition of "predetermined constraint" set forth by the sole inventor of the '810 patent, Dr. Ross

8    Williams, in a paper he wrote entitled "The Structure and Practise of the Blocklets Patent." Dr.

9    Williams testified that he created this paper to help "everyone" understand the meaning of the

10    '810 patent, a patent he describes as "impenetrable" and "confusing." Incredibly, Quantum has

11    taken the position that Dr. Williams, who drafted the specification and claims himself, has a

12    "manifestly wrong" understanding of the meaning of that term. And if that were not enough,

13    Quantum also inexplicably disagrees with its own expert's understanding of this term.

14    Quantum's proposed construction for "predetermined constraint" is not supported by the

15    intrinsic or extrinsic record. Quantum's unsupported construction would transform this term into a

16    functional limitation and render it indefinite under 35 U.S.C. § 112.

17    The parties' constructions for "subblock" are not far apart. Riverbed's construction is

18    preferable because it more clearly defines the contents of a "subblock."

19    Riverbed's construction for the phrase "an additional hierarchy of subblocks is formed

20    from at least one group of contiguous subblocks" clarifies this unwieldy phrase. Riverbed's

21    construction is explicitly supported by the specification. Ironically, Quantum criticizes Riverbed's

22    construction on the grounds that the language from the specification "raises more ambiguity than

23    it resolves." Quantum does not propose a construction for this phrase. It simply argues that

24    "[t]his term employs defined terms – no additional construction required beyond plain and

25    ordinary meaning." Quantum's proposal would do nothing to clarify the meaning of this

26    unorthodox phrase.

27

28

II.    **BACKGROUND ON THE '810 PATENT**

Dr. Ross Williams is the sole inventor of the '810 patent. Dr. Williams originally assigned the '810 patent to an Australian company called Trustus, which later assigned it to an Australian company founded by Dr. Williams called Rocksoft. Rocksoft was acquired by ADIC in March 2006, which was then acquired by Quantum in August 2006. Quantum asserts that it is an exclusive licensee of the '810 patent. The '810 patent issued in 1999.

A.    **A Principle Of Locality Governs The Partitioning Method Claimed In The '810 Patent**

The '810 patent involves a method for partitioning a block of data into subblocks. The partitioning technique claimed in the '810 patent is governed by a principle of locality, *i.e.*, only local data is evaluated when determining whether to partition data at a specific position in the block. This principle of locality is essential to the claimed partitioning method as Dr. Williams explained in a paper titled "The Structure and Practise of the Blocklets Patent." (Briggs Decl., Ex. A.)[1] (The '810 patent is also referred to as "the Blocklets Patent.") In this paper, Dr. Williams provides a plain English explanation of the terms used in claim 1:

> Even though there are at least five key concepts in the Blocklets patent, claim 1 remains by far the most important claim as it covers the parsing of blocks into subblocks. Here it is:
>
> > 1. A method for organizing a block b of digital data for storage, communication, or comparison, comprising the step of: partitioning said block b into a plurality of subblocks at at least one position k │ k+1 within said block, for which b[k-A+1...k+B] satisfies a predetermined constraint, and where A and B are natural numbers.
>
> Let us analyse this claim phrase by phrase.
>
> The claim starts out by saying "A method for organising a block b of digital data for storage, communication, or comparison". The purpose of these words is to indicate that this is a method claim and that the purpose of the claim is merely to organise a block of data, not to process it in any other way. The words "storage,

---

[1] "Briggs Decl., Ex. __" refers to the Exhibits attached to the Declaration Of Todd M. Briggs In Support Of Riverbed's Opposition Claim Construction Brief On Terms From U.S. Patent No. 5,990,810.

communication, or comparison" are purposefully broad and are intended to convey the general intent of the claim. This is not a specific claim for (e.g.) word processing or graphics or a similar specialised area. Rather it is a general purpose method for organising data of any kind.

The goal of the method is solely to "partition said block b into a plurality of subblocks". This may not seem ambitious, but the way in which it is done makes the partitioning and the claim significant. The word "partition' is used rather than "divide" because "partition' better conveys the division of the block b into mutually exclusive parts that exhaust the block.

Partitions must be placed "at at least one position k | k+1". There must be at least one position, because without at least one position block b is not partitioned at all. The notation k | k+1 is merely intended to define a position in b. The vertical bar represents the boundary between two bytes (or bits as also admitted in the Detailed Explanation part of the patent) with the two bytes being at position (i.e. having indexes within b of) k and k+1. The reason for this notation is that we need to refer to a position later in the claim and it's clearer to refer to a position as being between two bytes than it is to refer to a position by referring to a single byte because if you do that, it's not obvious whether the position is on the left or the right of the byte. Using the notation k | k+1 eliminates this ambiguity.

The interesting part of the claim is the phrase "for which b[k-A+1...k+B] satisfies a predetermined constraint, and where A and B are natural numbers". This sounds more complicated that it really is. Figure 2 shows what's happening here. To evaluate whether a partition should be made at the boundary between the bytes at position k and k+1, *we evaluate the bytes within a window consisting of A bytes to the left of the position and B bytes to the right. Only the bytes in this window can affect the decision of whether to put a boundary at position k | k+1.*



Figure 2: The parsing window.

"A and B are natural numbers" (i.e. 0, 1, 2, 3, ...). This phrase is simply intended to indicate that we are dealing in whole multiples of bytes. In most implementations, A and B will be constants (though the claim does not explicitly constrain them to be).

*It may seem overly restrictive to restrict the window being evaluated to A bytes to the left and B bytes to the right (i.e. a window of A+B bytes) of the position being evaluated. However, this is an important aspect of the claim because it captures in the broadest possible way the locality of the window evaluation process. Blocklet boundaries must, after all, be positioned based on data local to the position being evaluated. The degree of locality is left unspecified (in the parameters A and B), but the locality is important because without it, the same blocklets would not be created in the same way when the same data arises in*

*different global contexts.* For example, if a block b of 2M were being parsed into blocklets with a mean length of 8K, repeated data in different parts of the 2M will only be parsed into the same blocklets if the parsing algorithm places boundaries only on the bytes local to the candidate boundary. If the partitioning function were to take into account (for example) bytes b[0..k+B] in deciding whether to put down a partition, the slightest change in the earlier bytes in the block could affect whether a partition is placed at position k | k+1 and this will result in boundaries being placed that do not yield identical subblocks when the same slab of data appears in different places in b.

The phrase "predetermined constraint" is purposefully broad, as (assuming we are dealing with bytes), for a given A and B, there are 2^2^(8*(A+B)) possible constraint functions that could be used to implement the method. All that is meant by the term "constraint" is a function that accepts a block of bytes of length A+B and returns a boolean value to indicate whether a boundary should be placed between the A and B parts of the window.

*In summary, the intent of claim 1 is to capture the concept of dividing a block of data into subblocks at data dependent positions where each position is evaluated for boundaryness by examining only those bytes near to and adjacent to the position.*

Note: The claim does not prohibit the constraint function from ignoring some part (possibly some non-contiguous parts) of the window of A+B bytes. There is no requirement that the constraint function attend to all bytes in the window.

(Briggs Decl., Ex. A. at 3-4.)

Dr. Williams' paper confirms that the principle of locality is critical to the claimed partitioning technique. Specifically, he explains that the language in the claim "for which b[k-A+1 . . . k+B] satisfies a predetermined constraint" means that the predetermined constraint evaluates "only the bytes in this window [of length A + B] . . . ." (*Id.* at 3.)

**REDACTED**

1

2

REDACTED

3

4

5

6        Dr. Williams' paper is a trustworthy source of evidence that explains the meaning of claims

7    Dr. Williams characterized as "impenetrable" in plain English.  This paper was not generated in

8    the context of a pending litigation and was intended to provide "everyone" – which would

9    certainly include lay jurors – with an understanding of what the '810 patent means.

10       **B.        Dr. Williams Was Not The First To Invent A Method For Using Data In The
                  Block Itself To Partition Blocks of Data Into Variable-Length Subblocks**

11

12       Quantum asserts that the '810 patent is novel because "Dr. Williams was able to devise a

13   method for partitioning a block of data into a plurality of subblocks of variable length that could

14   be used to locate most of the duplicative data within a data set."  (Quantum's Opening Brief at 5.)

15   Quantum's assertion is incredible in light of documents it recently produced to Riverbed.  For

16   example, Quantum produced an email

17

18

19

20

21

22                                    REDACTED

23

24

25

26

27

28

1

REDACTED

2

3        Riverbed has also located many other items of prior art that invalidate claims in the '810

4  patent.  A paper written by a co-founder of Google – Sergey Brin – is one of many examples.  (*See*

5  Brin, S., Davis, J., and Garcia-Molina, H., "Copy Detection Mechanisms for Digital Documents,"

6  dated October 31, 1994 (Proceedings of the ACM SIGMOD Annual Conference, San Jose, May

7  1995) (Briggs Decl., Ex. E).)  Quantum itself recognizes that the Brin reference is damaging to the

8  '810 patent.  As recently as last year Dr. Williams and Quantum were looking for evidence that

9  would support a conception date of the '810 patent prior to the October 31, 1994 publication date

10  of the Brin reference.  (Briggs Decl., Ex. F).  Quantum was unable to do so and concedes that it

11  cannot establish a conception date prior to November 21, 1994.  (Quantum's Opening Brief at 4.)

12  Furthermore, during Dr. Williams' deposition, Quantum's counsel improperly ***instructed*** Dr.

13  Williams not to answer questions regarding the Brin reference on the grounds that such questions

14  sought a legal conclusion.  (Briggs Decl., Ex. B, at 237:23-245:10.)  Such improper instructions in

15  the face of invalidating prior art are telling.

16  **III.    LEGAL STANDARDS**

17        "The appropriate starting point for claim construction 'is always with the language of the

18  asserted claim itself.'"  *Cat Tech LLC v. TubeMaster, Inc.*, No. 2007-1443, 2008 WL 2188049

19  (Fed. Cir. May 28, 2008) (quoting *Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186

20  (Fed. Cir. 1998))).  "If the claim language is clear on its face, then our consideration of the rest of

21  the intrinsic evidence is restricted to determining if a deviation from the clear language of the

22  claims is specified. . . . If however the claim language is not clear on its face, then our

23  consideration of the rest of the intrinsic evidence is directed to resolving, if possible, the lack of

24  clarity."  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

25  "In addition to consulting the specification, [the Federal Circuit has] held that a court 'should also

26  consider the patent's prosecution history, if it is in evidence.'"  *Phillips v. AWH Corp.*, 415 F.3d

27  1303, 1317 (Fed. Cir. 2005) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980

28  (Fed. Cir. 1995))).

1      The Federal Circuit has "also authorized district courts to rely on extrinsic evidence, which

2  'consists of all evidence external to the patent and prosecution history, including expert and

3  inventor testimony, dictionaries, and learned treatises.'" *Id.*; *see also L.B. Plastics, Inc. v.*

4  *Amerimax Home Products, Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007) ("Since the intrinsic record

5  provides no further guidance to the meaning of the terms 'weld,' 'fuse' or 'ultrasonic or heat

6  welding,' the district court properly turned to extrinsic evidence in this case and consulted

7  dictionaries."). "[I]t is entirely appropriate, perhaps even preferable, for a court to consult

8  trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent

9  file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in

10  the pertinent technical field." *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190-EDL, 2002 WL

11  1892200, at *8 (N.D. Cal. Aug. 15, 2002), *aff'd*, 401 F.3d 1340 (Fed. Cir. 2005).

## IV. CONSTRUCTION OF "PREDETERMINED CONSTRAINT"

13      The term "predetermined constraint" is used in each independent claim of the '810 patent.

14  For example, claim 1 reads:

> 1. A method for organizing a block b of digital data for storage, communication, or comparison, comprising the step of:
>
> partitioning said block b into a plurality of subblocks at at least one position k | k+1 within said block, for which b[k-A+1 . . . k+B] satisfies a ***predetermined constraint***, and wherein A and B are natural numbers.

19      The parties' constructions for "predetermined constraint" are shown in the table below.

20  The table also includes Dr. Williams' construction for "predetermined constraint" from the paper

21  he wrote titled "The Structure and Practise of the Blocklets Patent."

| | |
|---|---|
| **Riverbed's Construction** | A function that accepts a window of bytes of length A+B and returns a boolean value to indicate whether a boundary should be placed between the A and B parts of the window. Only the bytes in the window of bytes of length A+B can affect the decision of whether a boundary should be placed at position k\|k+1. |
| **Quantum's Construction** | Criteria for identifying a subblock boundary. |
| **Dr. Williams' Construction** | The interesting part of the claim is the phrase "for which b[k-A+1...k+B] satisfies a predetermined constraint, and where A and B are natural |

numbers". This sounds more complicated that it really is. Figure 2 shows what's happening here. To evaluate whether a partition should be made at the boundary between the bytes at position k and k+1, we evaluate the bytes within a window consisting of A bytes to the left of the position and B bytes to the right. *Only the bytes in this window can affect the decision of whether to put a boundary at position k | k+1.*



**Figure 2: The parsing window.**

"A and B are natural numbers" (i.e. 0, 1, 2, 3, ...). This phrase is simply intended to indicate that we are dealing in whole multiples of bytes. In most implementations, A and B will be constants (though the claim does not explicitly constrain them to be).

\* \* \* \* \*

All that is meant by the term "constraint" is *a function that accepts a block of bytes of length A+B and returns a boolean value to indicate whether a boundary should be placed between the A and B parts of the window.*

### A.    Riverbed's Proposed Construction

Riverbed's construction is fully supported by and consistent with the claim language, the specification, the prosecution history, and Dr. Williams' explanation of the term "predetermined constraint."

#### 1.    A "Predetermined Constraint" Is "A Function That Accepts A Window Of Bytes Of Length A+B And Returns A Boolean Value To Indicate Whether A Boundary Should Be Placed Between The A And B Parts Of The Window."

The first sentence of Riverbed's construction states that a predetermined constraint is "a function that accepts a window of bytes of length A+B and returns a boolean value to indicate whether a boundary should be placed between the A and B parts of the window."[2]

_____

[2]   Quantum takes issue that Riverbed's construction would limit the window to "bytes." *See* Quantum's Opening Claim Construction Brief at 9.  Riverbed would stipulate that the window could also include "bits."

1    **Claim Language**:  The claim language supports Riverbed's construction.  The parties

2    essentially agree that the term "b[k-A+1 . . . k+B]" represents a window of digital data of length A

3    + B.  (Exhibit B to Joint Claim Construction And Prehearing Statement at 3, 17 (Document 107-3)

4    ("JCCS Exhibit B.")  The claim language states that the "predetermined constraint" must be

5    "satisfie[d]" by data within a window represented as "b[k-A+1 . . . k+B]."  This language indicates

6    that data within the window of length A + B must be input into a function that produces an output.

7    As a practical matter, it is not clear how one could determine whether the window of data of

8    length A + B satisfied a predetermined constraint if the predetermined constraint were not a

9    function.

10    **Specification**:  The specification supports Riverbed's construction.  The specification

11    consistently refers to a "constraint" as a "function."  (*See, e.g.*, '810 patent, col. 13:65-14:50.)

12    Under the heading "Choosing a Partitioning Constraint Function," the written description states

13    that "the requirements for the block partitioning constraint (e.g. in the form of a constraint

14    ***function F***) are not stringent" and that "care should be taken to select a ***function*** that suits the

15    application to which it is to be applied."  (*Id.*, col. 13:65-14:2.)

16    The specification also provides one example of how a window of data of length A + B

17    satisfies a "predetermined constraint."  The section titled "Example: Partitioning a Block" states:

18    "In this example, an example hash function H will be used to partition the block. . . . We will

19    assume that H returns a boolean value based on its argument and that a boundary is to be placed at

20    each $b_i|b_i$+1 for which H($b_i$-2, $b_i$-1, $b_i$) evaluates to true.  As the hash function accepts 3 byte

21    arguments, we start at $b_3|b_4$ and evaluate H($b_1$, $b_2$, $b_3$)."  (*Id.* col. 18:9-16.)  In this example, the

22    input to the hash function is 3 bytes in length (a window of bytes of length A+B) and the output of

23    the function is a boolean value that indicates whether a boundary should be placed between the A

24    and B parts of the window.  Therefore, the specification fully supports Riverbed's construction.

25    **Dr. Williams' Construction**:  Dr. Williams clarified the term "constraint" in his paper titled

26    "The Structure and Practise of the Blocklets Patent."  In that paper, Dr. Williams states that "[a]ll

27    that is meant by the term 'constraint' is a function that accepts a block of bytes of length A+B and

28    returns a boolean value to indicate whether a boundary should be placed between the A and B

1  parts of the window." (Briggs Decl., Ex. A, at 3.) This language is identical to Riverbed's

2  proposed construction.

3                                    REDACTED

4        Quantum's Expert's Construction:  In the Joint Claim Construction Statement the parties

5  filed with the Court, Quantum represented that its own expert, Professor Sergio Verdu, would

6  testify that "predetermined constraint" means "a function that accepts a block of bytes of length

7  A+B and returns a boolean value to indicate whether a boundary should be placed between the A

8  and B parts of the window." (JCCS Exhibit B at 20) ("Our [Quantum's] expert will testify that

9  one of ordinary skill in the art would understand the term 'predetermined constraint' to be defined

10 in the specification to mean a function that accepts a block of bytes of length A+B and returns a

11 boolean value to indicate whether a boundary should be placed between the A and B parts of the

12 window."). Quantum made a similar representation when it served its Preliminary Claim

13 Constructions and Extrinsic Evidence on Riverbed pursuant to the Patent Local Rules. (Briggs

14 Decl., Ex. G at 8) ("Dr. Verdu will testify that one of ordinary skill in the art would understand the

15 term 'predetermined constraint' to be defined in the specification to mean a function that accepts a

16 block of bytes of length A+B and returns a boolean value to indicate whether a boundary should

17 be placed between the A and B parts of the window."). Riverbed is at a loss as to understand how

18 Quantum can criticize Riverbed's proposed construction when it is in agreement with Quantum's

19 own expert's opinion.

20       **2.    Only The Bytes In The Window Of Bytes Of Length A+B Can Affect
              The Decision Of Whether A Boundary Should Be Placed At Position
21            k|k+1.**

22       The second sentence of Riverbed's construction for predetermined constraint states: "Only

23 the bytes in the window of bytes of length A+B can affect the decision of whether a boundary

24 should be placed at position k|k+1."

25       Claim Language:  This sentence clarifies what is inherent in the plain claim language and

26 captures the principle of locality that is central to the invention claimed in the '810 patent. Each

27 of the independent claims of the '810 patent includes the limitation of "partitioning" data such that

28

1  a window of data (represented by the notation "b[k-A+1 . . . k+B]") "satisfies a predetermined

2  constraint." Whether the predetermined constraint is satisfied depends on the window of data

3  defined by "b[k-A+1 . . . k+B]" and nothing else. Nothing in any of the claims suggests that any

4  data outside of the window defined by "b[k-A+1 . . . k+B]" can affect whether the predetermined

5  constraint is satisfied.

6       This sentence of Riverbed's construction also gives meaning to "predetermined." By only

7  evaluating the data within the window of length A +B, the same input values within the window of

8  length A + B will always produce the same predetermined output value. Put differently, the

9  function that accepts a window of length A+B will always return the same predetermined output

10  value when presented with a given set of input data within the window of length A + B.

11       Specification: The specification includes only one example of how a block of data can be

12  partitioned using a predetermined constraint. (See '810 patent, col. 18:4:50.) In that example, "a

13  hash function H [is] used to partition the block." (Id. at col. 18:29-31.) The hash function accepts

14  a 3 byte window of data and evaluates whether the hash of the 3 bytes is true or false. If the result

15  of the evaluation is false, no boundary is created. If the result of the evaluation is true, a boundary

16  is created. (Id., col. 18:15-23.) In this example, only the bytes in the 3 byte window affect the

17  evaluation (i.e., whether the predetermined constraint is satisfied).

18       Prosecution History: The '810 patent claims priority to two Australian applications, which

19  are part of the intrinsic record. See C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 861

20  (Fed. Cir. 2004). The first of those two applications, Application No. PN 1232, includes a

21  description of the "predetermined constraint" that is not included in the '810 patent. (Briggs

22  Decl., Ex. H.) Application No. PN 1232 states: "Instead of chopping the file up into fixed-size

23  blocks, the invention divides the block where the *local data* satisfies some constraint." Id. at 4

24  (emphasis added). The application continues: "Almost any method for choosing boundaries can

25  be used so long as the boundaries are picked based on the *local data* context." Id. Because

26  boundaries are chosen based on whether the "predetermined constraint" is satisfied, this statement

27  from the prosecution history tells us that whether a "predetermined constraint" is satisfied must be

28  "based on the local data context."

RIVERBED'S OPPOSITION CLAIM CONSTRUCTION BRIEF

1          <u>Dr. Williams' Construction:</u>  Any ambiguity in the intrinsic record is completely clarified

2    by Dr. Williams' paper entitled "The Structure and Practise of the Blocklets Patent."  In that

3    paper, Dr. Williams states that "[o]nly the bytes in this window can affect the decision of whether

4    to put a boundary at position k|k+1."  *Id.* at 3; *see also Voice Techs. Group, Inc. v. VMC Sys., Inc.,*

5    164 F.3d 605, 615 (Fed. Cir. 1999) ("An inventor is a competent witness to explain the invention

6    and what was intended to be conveyed by the specification and covered by the claims.").  Dr.

7    Williams explained in detail why it was essential to only evaluate the data within the window of

8    length A + B:

9            It may seem overly restrictive to restrict the window being evaluated
        to A bytes to the left and B bytes to the right (i.e. a window of A+B

10           bytes) of the position being evaluated. *However, this is an*
        *important aspect of the claim because it captures in the broadest*

11           *possible way the locality of the window evaluation process.*
        *Blocklet boundaries must, above all, be positioned based on data*

12           *local to the position being evaluated. The degree of locality is left*
        *unspecified (in the parameters A and B)*, but the locality is

13           important because without it, the same blocklets would not be
        created in the same way when the same data arises in different

14           global contexts.

15

16   (Briggs Decl., Ex. A, at 3 (emphasis added).)

17         In summarizing the intent of claim 1, Dr. Williams once again stressed the importance of

18   examining only the data within the window defined by A +B:  "In summary, the intent of claim 1

19   is to capture the concept of dividing a block of data into subblocks at data dependent positions

20   where each position is evaluated for boundaryness *by examining only those bytes near to and*

21   *adjacent to the position*."  (*Id.* (emphasis added).)

22

23

24                              REDACTED

25

26

27

28

1

2

3

4                                    REDACTED

5

6

7

8

9        Thus, the claim language, the specification, the prosecution history, and Dr. Williams'

10   paper and deposition testimony all lead to the same conclusion, *i.e.*, only the bytes in the window

11   of bytes of length A+B can affect the decision of whether a boundary should be placed at position

12   k|k+1.

13        **3.    Quantum's Arguments Against Riverbed's Construction Are Not
              Persuasive.**

14        Quantum criticizes Riverbed's construction on several grounds. First, Quantum argues

15   "[t]he language of the claim does not require that a boundary be placed at every position at which

16   the predetermined constraint is satisfied." This argument is directly contradicted by statements

17   made by Dr. Williams' lawyer in the prosecution of the Patent Cooperation Treaty ("PCT")

18   application that lead to the '810 patent. In response to a Written Opinion (Briggs Decl., Ex. I)

19   dated September 10, 1996, Dr. Williams' lawyer wrote that "in accord with the invention a

20   subblock boundary will be located between the positions of bits $b_k$ and $b_{k+1}$ ***each time*** the Function

21   F is performed returning an appropriate value which falls within a predetermined subclass of the

22   set of possible Function F result values." (Briggs Decl., Ex. J, at 1 (emphasis added).) The only

23   concrete example of a predetermined constraint in the specification likewise describes "placing a

24   boundary at ***each point*** where the preceding three bytes hash to a predetermined constant value."

25   *See* '810 patent, col. 14:41-44.

26        Next, Quantum's argument that "the invention provides for boundaries to be placed at

27   positions other than those at which the predetermined constraint is satisfied" misses the point. The

28

Case No. C 07-04161 WHA
                                    RIVERBED'S OPPOSITION CLAIM CONSTRUCTION BRIEF

1    Court is construing the term "predetermined constraint." Riverbed's proposed construction of

2    "predetermined constraint" includes two sentences that are intended to be read together: "A

3    function that accepts a window of bytes of length A+B and returns a boolean value to indicate

4    whether a boundary should be placed between the A and B parts of the window. Only the bytes in

5    the window of bytes of length A+B can affect the decision of whether a boundary should be

6    placed at position k|k+1." Riverbed is not proposing that a boundary can never be placed unless

7    the predetermined constraint has been satisfied because that would be inconsistent with claim 4,

8    which allows for an artificial bound to be imposed on subblock size. What Riverbed is proposing

9    is that when the **predetermined constraint** indicates that a boundary should be placed, that

10    decision depends only on the bytes in the window of length A+B. Riverbed's proposed

11    construction is entirely consistent with claim 4.

12          Riverbed is confident that the Court will see through Quantum's argument that Dr.

13    Williams, the sole inventor of the '810 patent, who drafted the specification and claims himself,

14    does not understand what "predetermined constraint" means. Dr. Williams wrote "The Structure

15    and Practise of the Blocklets Patent" paper to explain to prospective licensees or purchasers of the

16    '810 patent what the claims of that patent mean. (Briggs Decl., Ex. B, at 156:11-20.) He wrote in

17    that document that "[o]nly the bytes in this window can affect the decision of whether to put a

18    boundary at position k|k+1." (Briggs Decl., Ex. A, at 3.)

19                                                        REDACTED

20          Quantum's argument that "Dr. Williams is not an expert in claim construction" is

21    inapposite. There is no requirement that one be an expert in claim construction to construe claims.

22    The proper inquiry is whether a person is one of skill in the art. As the inventor of the '810 patent,

23    Dr. Williams is one of ordinary skill in the art. *Phillips*, 415 F.3d at 1313 (discussing "the well-

24    settled understanding that inventors are typically persons skilled in the field of the invention").

25          Nor do the cases that Quantum cites support Quantum's argument that the Court should

26    disregard Dr. Williams' understanding of "predetermined constraint." As the Federal Circuit has

27    explained: "An inventor is a competent witness to explain the invention and what was intended to

28    be conveyed by the specification and covered by the claims. . . . Although *Markman* and other

1   precedent caution the court against creative reconstruction of an invention by interested persons,

2   courts are not novices in receiving and weighing expertise on both sides of an issue." *Voice*

3   *Technologies Group, Inc. v. VMC Systems, Inc.*, 164 F.3d 605, 615-16 (Fed. Cir. 1999) (citing

4   *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)). In *Markman* the

5   Federal Circuit "did not hold that the inventor can not explain the technology and what was

6   invented and claimed; the Federal Circuit held only that the inventor can not by later testimony

7   change the invention and the claims from their meaning at the time the patent was drafted and

8   granted." *Id.* at 615. Dr. Williams did not engage in any "creative reconstruction of [his]

9   invention." He simply explained what the '810 patent means in plain English.

10      As the Federal Circuit explained in *Phillips*, a court is not "barred from considering any

11   particular sources or required to analyze sources in any specific sequence, as long as those sources

12   are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence."

13   415 F.3d at 1324. Nothing that Dr. Williams wrote in "The Structure and Practise of the Blocklets

14   Patent" paper or that he testified to at his deposition "contradict[s] claim meaning that is

15   unambiguous in light of the intrinsic evidence." Rather, his understanding is consistent with the

16   intrinsic record and helps to give meaning to a term that has no "ordinary and customary

17   meaning."

18      **B.    Quantum's Proposed Construction**

19      Quantum's proposed construction of "predetermined constraint" is "criteria for identifying

20   a subblock boundary." (JCCS Exhibit B at 4.) Quantum does not explain how this construction is

21   supported by the intrinsic record and provides no extrinsic support for its construction. Quantum

22   simply asserts that its construction "correctly captures the breadth of the term." (Quantum's

23   Opening Brief at 9.)

24      Quantum's proposed construction would in effect transform "predetermined constraint"

25   into a functional limitation covering any structure, material, or acts that perform the function of

26   "identifying a subblock boundary." "Criteria for identifying a subblock boundary" is functional

27   language. It is essentially the same as stating "means for identifying a subblock boundary."

28

1    Quantum's proposed construction is improper because it would give the claims the breadth

2  of a functional limitation without the tradeoff of being limited to structure described in the

3  specification and equivalents thereof.  The Federal Circuit explained that "[t]his requirement is the

4  tradeoff of means-plus-function claiming, enabling patentees to claim a list of structures identified

5  in the patent's written description using general, functional terminology, without the burden of

6  listing those structures within the text of the claim itself." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d

7  1364, 1377 (Fed. Cir. 2001); *see also Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d

8  1244, 1256 n.7 (Fed. Cir. 2008) ("For so-called means-plus-function limitations, claim scope is

9  limited to structure disclosed in the specification and equivalents. . . . This statutory provision was

10  meant to preclude the overbreadth inherent in open-ended functional claims, such as those

11  presented in this case which effectively purport to cover any and all means so long as they perform

12  the recited functions.").  The Court should not allow Quantum to transform "predetermined

13  constraint" into a functional limitation.  Such a construction would be improper and render the

14  term "predetermined constraint" indefinite under 35 U.S.C. § 112.

15    Another problem with Quantum's proposed construction is that it does not give meaning to

16  the word "predetermined" in "predetermined constraint."   Indeed, Quantum does not even attempt

17  to explain how is construction accounts for the word "predetermined."  A court "must give

18  meaning to all the words in [the] claims." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64

19  F.3d 1553 (Fed. Cir. 1995); *see also In re Sabatino*, 480 F.2d 911, 913 (C.C.P.A. 1973) ("Claim

20  limitations defining the subject matter of the invention are never disregarded.").  Quantum's

21  wholly unsupported construction for "predetermined constraint" should be rejected.

22  **V.    CONSTRUCTION OF "SUBBLOCK"**

| Riverbed's Construction | A part of the block consisting of a series of bits or bytes of the digital data from the block. |
|---|---|
| Quantum's Construction | A part of a block. |

27    There is no material difference between the parties' proposed constructions of "subblock."

28  The parties agree that a "subblock" is a part of a block, and the parties have stipulated that "block"

Case No. C 07-04161 WHA

RIVERBED'S OPPOSITION CLAIM CONSTRUCTION BRIEF

1  means "finite or infinite streams of zero or more bits or bytes of digital data." (JCCS Exhibit B at

2  2.) Riverbed's proposed construction is preferable because it makes clear that a subblock, like a

3  block, is made up of bits or bytes of digital data. Riverbed's construction therefore makes clear

4  that a subblock is digital data from the block as opposed to something associated with that data

5  such as the hash that is calculated in claim 7. That meaning is implicit in Quantum's proposed

6  construction; Riverbed's proposed construction simply makes that meaning explicit.

7         Quantum objects to Riverbed's proposed construction because it includes the phrase

8  "consisting of a series of bits or bytes." Quantum claims that "there is no support whatsoever in

9  the '810 patent specification for the proposition that either blocks or subblocks consist of only bits

10  or bytes and nothing else." (Quantum's Opening Brief at 10.) However, Quantum ignores the

11  definitional language for "blocks" and "subblocks" from the specification:

12         The term block and subblock both refer, without limitation, to finite
       blocks or infinite blocks (sometimes called streams) of zero or more
13     ***bits or bytes of digital data***. Although the two different terms
       ("blocks" and "subblock") essentially describe the same substance
14     (digital data), the two different terms have been employed in this
       specification to indicate the role that a particular piece of data is
15     playing. The term "block" is usually used to refer to raw data to be
       manipulated by aspects of the invention. The term "subblock" is
16     usually used to refer to a part of a block. "Blocks" are "partitioned"
17     into "subblocks".

18  ('810, col. 2:51-62 (emphasis added).) "Bit" is "[s]hort for binary digit; either 1 or 0 in the binary

19  number system," and a bit "is the smallest unit of information handled by a computer." (Microsoft

20  Press Computer Dictionary 44 (2d ed. 1994) (Briggs Decl., Ex. K).) Because a bit is "the smallest

21  unit of information handled by a computer," all digital data necessarily consists of bits. A "byte"

22  is "[a] unit of information consisting of 8 bits." (Id. at 59.) Quantum's argument that there could

23  be digital data that consists of anything other than bits or bytes is nonsensical and technically

24  impossible.

25

26

27

28

## VI.    CONSTRUCTION OF "AN ADDITIONAL HIERARCHY OF SUBBLOCKS IS FORMED FROM AT LEAST ONE GROUP OF CONTIGUOUS SUBBLOCKS"

| Riverbed's Construction | Multiple layers of subblocks are constructed from one or more initially contiguous subblocks by progressively restricting a constraint function to generate the multiple layers of subblocks, where the boundaries of the higher layer subblocks are aligned with the subblock boundaries of all the subblock layers below it. |
|---|---|
| Quantum's Construction | This term employs defined terms – no additional construction required beyond plain and ordinary meaning. |

The only claim including the phrase "an additional hierarchy of subblocks is formed from at least one group of contiguous subblocks" is dependent claim 6, which reads:

> 6. The method of claim 1, wherein an additional hierarchy of subblocks is formed from at least one group of contiguous subblocks.

That phrase appears only once in the written description, simply repeating the language of claim 6. ('810 patent, col. 3:42-45 ("In a further aspect of the invention, the invention provides a method according to aspect 1, wherein an additional hierarchy of subblocks is formed from one or more groups of contiguous subblocks.").)

The only other use of the term "hierarchy" in the '810 patent is column 7, lines 54-56, which states: "FIG. 9 shows how subblocks can be organized into a hierarchy. Such a hierarchy can be constructed by progressively restricting a constraint F." Figure 9 is shown below. As illustrated in Figure 9, multiple layers of subblocks are constructed from initially contiguous subblocks by progressively restricting a constraint function to generate the multiple layers of subblocks. The boundaries of the higher layer subblocks are aligned with the subblock boundaries of all the subblock layers below it.



**Figure 9**

-18-

1

### A.    Riverbed's Proposed Construction

2    Riverbed proposes that the Court construe the phrase "an additional hierarchy of subblocks

3  is formed from at least one group of contiguous subblocks" to mean "[m]ultiple layers of

4  subblocks are constructed from one or more initially contiguous subblocks by progressively

5  restricting a constraint function to generate the multiple layers of subblocks, where the boundaries

6  of the higher layer subblocks are aligned with the subblock boundaries of all the subblock layers

7  below it."

8    Riverbed's proposed construction is consistent with the broadest meaning given to that

9  phrase in the specification.  Riverbed does not understand how Quantum can object to Riverbed's

10  proposed construction for including the words "higher layer subblocks."  (Quantum's Opening

11  Brief at 17.)  This Court construed claims including the term "hierarchically" last year in *Comcast*

12  *Cable Commc'ns Corp., LLC v. Finisar Corp.*, No. C 06-04206 WHA, 2007 WL 1052821 (N.D.

13  Cal. Apr. 6, 2007).  *See id.* at *6-8.  As the Court explained, "[t]he word 'hierarchy' is defined as

14  'a body of persons or things ranked in grades, orders, or classes, one above another; a system or

15  series of terms of successive rank.'"  *Id.* at *7 (quoting *Oxford English Dictionary* (2d ed. 2001)).

16  Riverbed's proposed construction gives a meaning of hierarchy consistent with that definition and

17  with the Court's construction in *Comcast.  See Comcast*, 2007 WL 1052821, at *8 ("A

18  'hierarchically arranged set of indices for referencing data in said information database' is held to

19  mean 'a set of ranked indices used to reference data within the database, with the higher-level

20  indices giving access to the lower-level indices.'").  A hierarchy necessarily has higher levels and

21  lower levels, whether they are "higher-level indices" and  "lower-level indices" as in *Comcast* or

22  "higher level subblocks" as and "subblock layers below" the higher level subblocks as in this case.

23  Quantum's objection to Riverbed's proposed construction has no merit.

24    Riverbed's proposed construction also gives meaning to the requirement stated in claim 6

25  that the group of subblocks from which an additional hierarchy of subblocks is formed be

26  "contiguous" by requiring that "the boundaries of the higher layer subblocks are aligned with the

27  subblock boundaries of all the subblock layers below it."  A construction that does not require the

28  boundaries of higher layer subblocks to be aligned with the subblock boundaries of all the

1  subblock layers below them could allow for "intervening" subblocks within the group of

2  subblocks from which the additional hierarchy of subblocks is formed.  The Federal Circuit has

3  construed the term "contiguous" as requiring the absence of "intervening structure."  *See*

4  *Honeywell Inc. v. Victor Co. of Japan, Ltd.*, 298 F.3d 1317, 1324 (Fed. Cir. 2002) ("The absence

5  of intervening structure is inherent even in the broad definition of 'contiguous.'").  In the language

6  of the '810 patent, there cannot be intervening subblocks in the group of subblocks from which an

7  additional hierarchy of subblocks is formed.

8       **B.    Quantum's Proposed Construction**

9       As Riverbed understands Quantum's argument, Quantum is arguing that no additional

10  construction of the phrase "an additional hierarchy of subblocks is formed from at least one group

11  of contiguous subblocks" is required beyond the constructions that Quantum has proposed for

12  terms used in that phrase.  While Quantum has proposed a construction for "subblock," which is

13  discussed above, and constructions for "hierarchy" and "contiguous subblocks," which are

14  discussed below, Quantum has not proposed a construction that explains how an additional

15  hierarchy of subblocks "is formed."  However, construction of these other terms does not provide

16  a clear meaning to what it means to "form" an additional hierarchy of subblocks, and the Court

17  should construe the entire phrase "an additional hierarchy of subblocks is formed from at least one

18  group of contiguous subblocks" to resolve this ambiguity.

19       Quantum has proposed that "hierarchy" should be construed to mean "A system or series

20  of terms of successive rank."  (JCCS Exhibit B at 20.)  Quantum's proposed construction of

21  "hierarchy" is taken word for word from the "glossary" of the Internet site

22  http://www.domainhandbook.com.  (*See* http://www.domainhandbook.com/gloss.html (Briggs

23  Decl., Ex. L) (stating that a "hierarchy" is "[a] body of persons or things ranked in grades, orders,

24  or classes, one above the other; in natural sciences and logic, a system or series of terms of

25  successive rank (as classes, orders, genera, species, etc.), used in classification.").)  Quantum has

26  provided no reason why it thinks that a website about Internet domain names is relevant to claim

27  construction of the '810 patent.  *See Ferguson Beauregard/Logic Controls, Div. of Dover*

28  *Resources, Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1348 (Fed. Cir. 2003) (Rader, J.,

-20-

1    concurring) ("[W]hen a court relies on a dictionary definition, it must include additional

2    reasoning to substantiate its choice amongst many possible definitions in many possible

3    dictionaries at many possible times.").

4         Quantum has proposed that "contiguous subblocks" should be construed to mean "[a]

5    range of subblocks." (JCCS Exhibit B at 21.) As discussed above, Quantum's proposed

6    construction of "contiguous subblocks" is inadequate because it does not require that the range of

7    subblocks have the "absence of intervening [subblocks]." *See Honeywell*, 298 F.3d at 1324 ("The

8    absence of intervening structure is inherent even in the broad definition of 'contiguous.'").

9         The problem with Quantum's argument is that even if the Court construes the terms

10   "hierarchy" and "contiguous subblocks," the phrase "an additional hierarchy of subblocks is

11   formed from at least one group of contiguous subblocks" still would not have a clear meaning

12   because it is not clear how an additional hierarchy of subblocks "is formed." Quantum cites

13   *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), for the proposition that, "In some cases,

14   the ordinary meaning of claim language as understood by a person of skill in the art may be

15   readily apparent . . . , and claim construction . . . involves little more than the application of the

16   widely accepted meaning of commonly understood words." (Quantum's Opening Brief at 13

17   (ellipses in original).) But this is not one of those cases. Quantum has not argued that the verb

18   "form" has an accepted meaning in the art. Accepting Quantum's argument would also mean

19   ignoring the part of the written description that explains that an additional hierarchy of subblocks

20   "can be constructed by progressively restricting a constraint F" as illustrated in Figure 9. ('810

21   patent, col. 7:54-56.) *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1324 (Fed. Cir.

22   2001) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must

23   look at the ordinary meaning in the context of the written description and the prosecution

24   history."). The Court should adopt Riverbed's proposed construction because it "stays true to the

25   claim language and most naturally aligns with the patent's description of the invention." *Phillips*,

26   415 F.3d at 1315.

27

28

## VII.    **CONCLUSION**

For the reasons stated in this brief, the Court should adopt Riverbed's proposed constructions for terms from the '810 patent.

DATED:  June 12, 2008                    Respectfully submitted,

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP


By  /s/  Claude M. Stern
    Claude M. Stern
    Attorneys for RIVERBED TECHNOLOGY, INC.

RIVERBED'S OPPOSITION CLAIM CONSTRUCTION BRIEF