1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      Claude M. Stern (Bar No. 96737)
2     claudestern@quinnemanuel.com
      Todd M. Briggs (Bar No. 209282)
3     toddbriggs@quinnemanuel.com
    555 Twin Dolphin Drive, Suite 560
4   Redwood Shores, California  94065-2139
    Telephone:    (650) 801-5000
5   Facsimile:    (650) 801-5100

6   Attorneys for RIVERBED TECHNOLOGY, INC.

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  RIVERBED TECHNOLOGY, INC., a            CASE NO. C 07-04161 WHA
    Delaware corporation
12                                          Honorable William H. Alsup
                  Counterclaimant,
13                                          **RIVERBED'S REPLY CLAIM
          vs.                               CONSTRUCTION BRIEF ON TERMS
14                                          FROM U.S. PATENT NO. 7,116,249**
    QUANTUM CORPORATION, a Delaware
15  corporation,                            Date:    July 24, 2008
                                            Time:    1:30 p.m.
16                Counterdefendant.         Crtrm.:  Courtroom 9

17  QUANTUM CORPORATION, a Delaware
    corporation,
18
                  Counterclaimant,
19        vs.

20  RIVERBED TECHNOLOGY, INC., a
    Delaware corporation,
21
                  Counterdefendant.
22

23

24            **  REDACTED VERSION FOR PUBLIC FILING  **

25

26

27

28

1  **I.    INTRODUCTION**

2      Riverbed Technology, Inc. ("Riverbed") submits this reply brief in support of its proposed

3  constructions and in opposition to the constructions proposed by Quantum Corporation

4  ("Quantum") for U.S. Patent No. 7,116,249 ("the '249 patent"). The two terms that the parties

5  have isolated from the '249 patent for the Court to construe are "reference label" and "back-end

6  storage system."

7  **II.    THE '249 PATENT DOES NOT REQUIRE THAT A "REFERENCE LABEL" BE "GLOBALLY UNIQUE"**

8

9      The parties agree that a "reference label" is "data used to identify a segment." Quantum

10  would have the Court add the limitation that a "reference label" must be "globally unique."

11      Nothing in the claim language requires that a "reference label" be "globally unique."

12  Quantum does not even attempt to argue in its opposition that the claim language supports the

13  requirement that a "reference label" be "globally unique."

14      The written description of the '249 patent uses the term "globally unique reference labels"

15  only once. That one reference to "globally unique reference labels" is made in part of the written

16  description discussing FIG. 12, which is shown below:

17



18

19

20

21

22

23

24

25                                    FIG. 12

26      Unlike other embodiments described in the '249 patent, the embodiment illustrated in FIG.

27  12 includes more than one element that assigns reference labels. As illustrated in FIG. 12, both

28  the Client Transaction Accelerator and the Server Transaction Accelerator include transaction

-1-                Case No. C 07-04161 WHA

RIVERBED'S REPLY CLAIM CONSTRUCTION BRIEF

1    transformers ("TT"). *See* col. 14:2-33. Each of those transaction transformers assigns reference

2    labels to segments of data. The '249 patent explains that "[a]s each TT creates bindings, it assigns

3    globally unique reference labels so that a recipient of a reference label will always be able to

4    replace it with unambiguous segment data." Col. 15:19-21.

5         The term "globally unique reference labels" only makes sense if the embodiment includes

6    more than one device that assigns reference labels to data segments, as in the embodiment

7    illustrated in FIG. 12. Consider, for example, the embodiment illustrated in FIG. 5, which is

8    shown below:



FIG. 5

25        In the embodiment illustrated in FIG. 5, there is only one point at which reference labels

26   are assigned. Each of the data segments $S_A$, $S_B$, $S_C$, $S_D$, and $S_E$ are assigned reference labels $R^1_{15}$,

27   $R^1_{16}$, $R^1_{17}$, $R^1_3$, and $R^1_8$ respectively. Each of those five reference labels references a unique data

28   segment and is thus "unique." But it does not add any meaning or even make sense to call them

RIVERBED'S REPLY CLAIM CONSTRUCTION BRIEF

1    "globally unique." In contrast, because the embodiment illustrated in FIG. 12 includes two

2    transaction transformers that each assigns reference labels to data segments, it makes sense to call

3    those reference labels "globally unique." The client-side transaction transformer should be aware

4    not just of which reference labels it has assigned to data segments for those reference labels to be

5    globally unique, it should also be aware of the reference labels that the server-side transaction

6    accelerator has assigned to data segments. If a reference label has been assigned to a data segment

7    by the client-side transaction transformer then the server-side transaction transformer should not

8    assign that same reference label to a different data segment if that reference label is to be globally

9    unique. In this context, the term "globally unique" means that the references are unique in the

10    system shown in FIG. 12.

11         Significantly, the claims of the '249 patent are not directed to the embodiment of FIG. 12

12    involving two transaction transformers where the term "globally unique" is used. Rather, the

13    claims of the '249 patent are directed to the single storage system embodiment of FIG. 14 where

14    the term "globally unique" is not used. FIG. 14 is shown below.



FIG. 14

23         Quantum's proposed "globally unique" construction is also inconsistent with Federal

24    Circuit cases holding that "[g]eneral descriptive terms will ordinarily be given their full meaning;

25    modifiers will not be added to broad terms standing alone." *Johnson Worldwide Associates, Inc.*

26    *v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *see also Virginia Panel Corp. v. MAC Panel*

27    *Co.*, 133 F.3d 860, 865-66 (Fed. Cir. 1997) (unmodified term "reciprocating" not limited to linear

28

1  reciprocation); *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d

2  615, 621-22 (Fed. Cir. 1995) (unmodified term "associating" not limited to explicit association).

3         The only use of the term "globally unique" in the '249 patent is the sentence at col. 15:19-

4  21 stating: "As each TT creates bindings, it assigns globally unique reference labels so that a

5  recipient of a reference label will always be able to replace it with unambiguous segment data." If

6  Quantum were correct and all reference labels were already "globally unique" the term "globally

7  unique reference labels" would be redundant. Quantum's proposed construction has the same

8  problem as the district court's construction in *Old Town Canoe Co. v. Glenwa, Inc.*, 55 Fed. Appx.

9  918 (Fed. Cir. 2003). In *Old Town Canoe*, "the trial court relied on the written description's

10 statement: '[t]he sit-on-top kayak is somewhat similar to a surfboard in overall shape, but

11 normally has a generally V-shaped hull portion and a deeper draft to allow better tracking.'" *Id.* at

12 921 (alteration in original). Relying on that statement on the written description, the district court

13 construed the term "hull" to mean "[t]he bottom portion of a sit-on-top kayak, with a bow and

14 stern, generally V-shaped to create a deeper draft than a surfboard to obtain better tracking." *Old

15 Town Canoe Co. v. Glenwa, Inc.*, 229 F. Supp. 2d 1151, 1158 (D. Or. 2002). The Federal Circuit

16 held that the district court's construction of the term "hull" improperly limited the meaning of that

17 term. The Federal Circuit explained that "the plain meaning of 'hull' does not include a particular

18 shape (V) because otherwise the phrase 'V-shaped hull portion' would be redundant." *Old Town

19 Canoe*, 55 Fed. Appx. at 921. The court concluded that "[i]n the claims, 'hull' appears to be a

20 generally descriptive term and as such the appellant is correct that it should be given its full

21 meaning and no modifiers should be added." *Id.*

22        Quantum's proposed requirement has the same problem as the district court's construction

23 in *Old Town Canoe*. The meaning of "reference label" does not include "globally unique" because

24 otherwise the phrase "globally unique reference labels" would be redundant. The term "reference

25 label" is a generally descriptive term and should be given its full meaning and no modifiers should

26 be added.

27        Riverbed is at a loss to understand how Quantum can argue that "Riverbed cannot and does

28 not point to a single embodiment in which reference labels are not unique." Quantum's Opp'n at

1    6. As Riverbed pointed out in its opening brief, the '666 patent, which is explicitly incorporated

2    by reference in the '249 patent, describes the "rare cases" in which "two degenerate segments with

3    the same reference but different segment data exist" when each segment reference is a hash of the

4    segment data. *See* Riverbed's Opening Br. at 9; U.S. Patent No. 7,120,666 col. 14:54-62 (Briggs

5    Opening Decl. Exh. B)[1]. These rare cases are inherent in using such a scheme for compressing

6    data.

7

8

9

10                                          REDACTED

11

12

13

14

15                                                                                     Quantum's

16    '810 patent recognizes this same inherent property of hash functions, stating that "[i]n a wide hash

17    function, the output value is so wide (e.g. 128 bits) that the probability of any two randomly

18    chosen blocks having the same hashed value is negligible (e.g. about one in $10^{38}$)."

19         Quantum argues that "[t]he message would be gibberish if the wrong segment were

20    attached to the label." Quantum's Opp'n at 4. But if that happens infrequently enough it may be

21    an acceptable tradeoff to realize the benefit of such data compression schemes. What is

22    remarkable about Quantum's brief is how it criticizes the data compression scheme used in its own

23    products. Quantum first argues that its accused products do not infringe because "Quantum

24    _____

25    [1]  "Briggs Opening Decl." refers to the Declaration Of Todd M. Briggs In Support of

26    Riverbed's Opening Claim Construction Brief On Terms From U.S. Patent No. 7,116,249 (Docket
      No. 117).

27    [2]  "Briggs Reply Decl." refers to the Declaration Of Todd M. Briggs In Support of Riverbed's
      Reply Claim Construction Brief On Terms From U.S. Patent No. 7,116,249.

28

51198/2540894.3

1   identifies data segments using hashes calculated with hash functions that allow for the possibility

2   that different segments of data will have the same identifying hash." Quantum's Opp'n at 2. But

3   Quantum later argues that "if the wrong segment were attached to the label" then "the result would

4   be chaos and dysfunction." *Id.* at 4.

5          Quantum cannot dispute that its products use "unique reference labels." Quantum's User

6   Guide for the its accused DXi products states:

7          The DXi3500 and DXi5500 systems can reduce the amount of
           storage capacity required through a data deduplication process. The
8          term data deduplication refers to the elimination of redundant data.
           During this process, duplicate data is ignored, leaving only one copy
9          of the data to be stored. *Indexing data is retained and used to
           restore the previously deduplicated data. Since only the unique*
10         *data is stored on the system*, the amount of required storage space is
           reduced.
11
    Quantum DXi3500 and DXi5500 User's Guide at 4 (Briggs Reply Decl. Exh. B) (emphasis
12
    added); *see also* ESG Lab Validation Report at 7 (Briggs Reply Decl. Exh. C) (explaining that in
13
    Quantum's DXi products "[d]ata de-duplication reduces capacity requirements by ensuring that
14
    only unique data is written to disk" and that "[a]s backup data is written, unique blocks are
15
    identified and only unique backup data is stored. In other words, when a block is ingested that has
16
    already been processed, the appliance stores a pointer to the original block instead of copying the
17
    block again."). It appears that Quantum may be attempting to introduce the stray limitation
18
    "globally" into its construction so that it can somehow argue later that the unique reference labels
19
    used in its accused products are not "globally" unique.
20
           Quantum offers no explanation for why it improperly changed its preliminary construction
21
    of reference label from "data representing a segment used to locate bindings of segment data and
22
    segment references" to "globally unique data used to identify segment" just hours before the
23
    parties filed their Joint Claim Construction Statement. *See* Quantum's Preliminary Claim
24
    Constructions at 5 (Briggs Opening Decl. Exh. C); JCCS Exh. A at 16. Nor does Quantum offer
25
    an explanation why its expert, Dr. Mazieres, initially stated that "reference labels" do not have to
26
    be "globally unique," but changed his mind at the eleventh hour. *See* Quantum's Preliminary
27
    Claim Constructions at 5 (Briggs Opening Decl. Exh. C) ("Dr. Mazieres will testify that one of
28

1  ordinary skill in the art would understand the term 'reference label' to be defined in the

2  specification to mean data representing a segment used to locate bindings of segment data and

3  segment references.").

4  **III.    CONSTRUCTION OF "BACK-END STORAGE SYSTEM"**

5        Riverbed proposes that the term "back-end storage system" be given its plain and ordinary

6  meaning.  Quantum's proposed construction for "back-end storage system" is "a non local, HCS-

7  enabled storage system that accepts commands from a front-end file server to store and retrieves

8  [sic] whole files" – a tortured construction that imports every conceivable limitation Quantum

9  could identify from the specification.[3]

10       **A.    "Back-End Storage System" Has An Established Meaning In The Art**

11       Quantum's argument that that the term "back-end storage system" does not have "an

12  established meaning in the relevant art" cannot be taken seriously.  Quantum's Opp'n at 12.  The

13  IEEE dictionary defines "backend" as "[p]ertaining to one part of a process which has two parts,

14  the frontend and the backend; the frontend usually denotes what the user sees and the backend

15  denotes some special process." *The Authoritative Dictionary of IEEE Standard Terms* 77 (7th ed.

16  2000) (Briggs Reply Decl. Exh. D).  Quantum's own website includes a "glossary" page that

17  defines "client/server" as "[a]rchitecture where computing responsibility is distributed between

18  frontend and ***back-end systems*** and programs." *See* "Quantum Glossary,"

19  http://www.quantum.com/Resources/Glossary/Index.aspx (emphasis added) (Briggs Reply Decl.

20  Exh. E).  Documents produced by Quantum further show that Quantum employees themselves use

21  the term "back-end storage" among themselves when referring to the accused DXi and StorNext

22  products.

23                                **REDACTED**

24

25       [3]  Quantum does not explain why it and its expert initially proposed that this term means "a

26  non-local, near-line storage system that only communicates with the front end file server," and

    then, just hours before the parties filed their Joint Claim Construction Statement, Quantum

27  advanced a new construction that swept in every limitation it could locate in the specification.

28

REDACTED

Thus, Quantum's own documents establish that "back-end storage" system has simple and well understood meaning. And Quantum cites no evidence in support of its argument that the term "back-end storage system" does not have an established meaning in the art.

**B.    Quantum's Proposed Construction For "Back-End Storage System" Is A Blatant Attempt To Read Limitations From The Specification Into The Claims**

The only argument that Quantum makes for its proposed construction of the term "back-end storage system" is that the term should be restricted the preferred embodiment described in the specification. The Federal Circuit has repeatedly rejected that argument and held that "[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations." *Varco, L.P. v. Pason Systems USA Corp.*, 436 F.3d 1368, 1375 (Fed. Cir. 2006). "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)). There are no such "words or expressions of manifest exclusion or restriction" in the '249 patent and Quantum does not even attempt to argue that there are.

None of the limitations that Quantum is asking the Court to read in the claims is required by the claims or the specification.

First, nothing in the claims or the specification requires that a "back-end storage system" be "non-local." The term "non-local" is not used in the claims or even in the specification. It would be improper to import a limitation that is simply pulled out of thin air into the construction for this term.

1    Second, nothing in the claims or the specification requires that a "back-end storage

2    system" be "HCS-enabled." ("HCS" is an acronym for "Hierarchical Content-Induced

3    Segmentation." *See* col. 10:33-35.) Quantum claims that "the specification states with great

4    specificity that 'HCS can be used' with the invention of claim 19, not that the front-end/backend

5    formation of claim 19 is generally applicable to non-HCS embodiments." Quantum's Opp'n at

6    12; *see also* col. 16:37-40 ("In another embodiment, *HCS can be* used as a complementary

7    component of a more standard, operating system-based file system by combining the NLFS

8    described above with a file system front-end." (emphasis added)). However, the very language in

9    the specification Quantum cites – "HCS *can be* used" – undermines Quantum's argument. The

10    ordinary meaning of the word "can" is permissive rather than restrictive. *See Source Search*

11    *Technologies, LLC v. Lending Tree, LLC*, No. 04-4420, 2007 WL 1302443, at *8 (D.N.J. May 2,

12    2007) ("The word 'must' is mandatory language; whereas 'may' and 'can' are permissive

13    terms."). Stating in the specification that HCS *can be* used does not in any way mean that HCS

14    *must be* used in the specification, much less the claims.

15    Third, nothing in the claims or the specification requires that a "back-end storage system"

16    "accep[t] commands from a front-end file server to *store and retrieves [sic] whole files*." Indeed,

17    the claim language itself states "sending or receiving *contents of the file* between the front-end

18    file system and the back-end storage system." This language makes clear that portions of the file,

19    as opposed to the whole file, can be sent to and from the "back-end storage system." The

20    specification also makes clear that "whole-file accesses" are a preferred embodiment. *See* col.

21    15:44-46 ("A better approach is to apply HCS to a file system that employs whole-file accesses

22    rather than block-based accesses."). That statement by its own terms is a preferred embodiment

23    and does not suggest "a clear intention to limit claim scope" and therefore "is an insufficient basis

24    on which to narrow the claims." *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, No. 2007-

25    1277, __ F.3d __, 2008 WL 1966704, at *11 (Fed. Cir. May 7, 2008) ("Appellees seize on the

26    specification's description of a preferred embodiment . . . . This description of a preferred

27    embodiment, in the absence of a clear intention to limit claim scope, is an insufficient basis on

28    which to narrow the claims.").

1    The cases cited by Quantum do not support its proposed construction. In *Nystrom v. Trex*

2    *Co.*, 424 F.3d 1136 (Fed. Cir. 2005), the Federal Circuit found that the term "board" was limited to

3    "wood cut from a log." The court held that "[a]n examination of the term 'board' in the context of

4    the written description and prosecution history of the '831 patent leads to the conclusion that the

5    term 'board' must be limited to wood cut from a log." *Id.* at 1143. The inventor made numerous

6    statements in the prosecution history indicating that his invention was limited to wood cut from a

7    log. *Id.* at 1144-45. The court also recognized that "both parties acknowledge[d] the ordinary

8    meaning of 'board' as 'a piece of sawed lumber.'" *Id.* at 1145. Here, there is nothing in the

9    prosecution history that supports Quantum's construction, and Riverbed does not acknowledge that

10    the ordinary meaning of "back-end storage system" contains any of the limitations in Quantum's

11    proposed construction. Furthermore, unlike the patentee in *Nystrom*, Riverbed is not arguing for a

12    construction that is broader than the ordinary meaning of "back-end storage system." *Id.* at 1145-

13    46.

14    Next, Quantum misrepresents the Federal Circuit's decision in *Network Commerce, Inc. v.*

15    *Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005). Quantum claims, without citation, that "the

16    disputed term 'download component' was not clarified by the claim language." Quantum's Opp'n

17    at 10. But the court did find that the meaning of the term "download component" was clarified by

18    the claim language. *See Network Commerce*, 422 F.3d at 1359 ("[T]he claims define how the

19    download component is obtained and in general terms what the download component does."). 

20    Indeed, the court's construction for "download component" was primarily based on the claim

21    language itself. The court identified three characteristics of a "download component" from the

22    claim language and included those three characteristic in its construction for that term. *Id.* at

23    1358-61. After looking at the claim language, the court next looked to the specification and

24    refined one of the three characteristics based on the specification. *See id.* at 1360. In contrast,

25    Quantum's construction is not based on the claim language and attempts to import virtually every

26    limitation it can locate into its construction for "back-end storage system."

27

28

1    IV.    **CONCLUSION**

2           For the reasons stated in this brief, the Court should adopt Riverbed's proposed

3    constructions. "Reference label" should be construed as "data used to identify a segment." The

4    term "back-end storage system" should be given its plain and ordinary meaning and does not

5    require clarification.

6    DATED: June 19, 2008                    Respectfully submitted,

7                                            QUINN EMANUEL URQUHART OLIVER &
                                             HEDGES, LLP
8

9
                                            By /s/ Todd M. Briggs
10                                              Todd M. Briggs
                                                Attorneys for Counterclaimant and
11                                              Counterdefendant, RIVERBED TECHNOLOGY,
                                                INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28